**In re JOHNS–MANVILLE CORPORA-TION, et al., Debtors.**

**Bankruptcy Nos. 82 B 11656 through 82 B 11676.**

United States Bankruptcy Court, S.D. New York.

Jan. 23, 1984.

Anderson, Russell, Kill & Olick, P.C. by Arthur S. Olick, New York City, for Keene Corp.

Davis, Polk & Wardwell by Stephen H. Case, Lowell Gordon Harriss, Miriam G. Cedarbaum, and Levin & Weintraub & Crames by Michael J. Crames, New York City, for Johns-Manville Corporation, et al., debtors.

Moses & Singer by Robert J. Rosenberg, Babette Tenzer, Michael S. Kushner, New York City, for the Committee of Asbestos-Related Litigants and/or Creditors.

Milbank, Tweed, Hadley & McCloy by John J. Jerome, New York City, for the Committee of Unsecured Creditors.

Hahn & Hessen by George A. Hahn, Angela G. Tese, New York City, for the Committee of Equity Security Holders.

Greene, O'Reilly, Agnew & Broillet by George M. Rosenberg, Charles B. O'Reilly, Aaron H. Simon, Franklin A. Bonin, Los Angeles, Cal., for plaintiff Peter John Robinson; Finkel, Goldstein & Berzow, New York City, of counsel.

Gilbert, Segall & Young by Elihu Inselbuch, New York City, for Daniel J. Burke.

## DECISION AND ORDER ON KEENE'S MOTION TO APPOINT A LEGAL REPRESENTATIVE FOR FUTURE CLAIMANTS

BURTON R. LIFLAND, Bankruptcy Judge.

### I. *Introduction and Issue Presented*

Keene Corp. has put before this Court a motion to appoint a legal representative for asbestos-exposed future claimants in the Manville reorganization case. It is abundantly clear that the Manville reorganization will have to be accountable to future asbestos claimants whose compelling interest must be safeguarded in order to leave a residue of assets sufficient to accommodate a meaningful resolution of the Manville asbestos-related health problem. The term "future asbestos claimants" is defined for these purposes to include all persons and entities who, on or before August 26, 1982,

came into contact with asbestos or asbestos-containing products mined, fabricated, manufactured, supplied or sold by Manville and who have not yet filed claims against Manville for personal injuries or property damage. These claimants may be unaware of their entitlement to recourse against Manville due to the latency period of many years characterizing manifestation of all asbestos related diseases. *See Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1038 n. 3 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). *See also* Irving J. Selikoff, Douglas H.K. Lee, Asbestos and Disease, Academic Press, Inc. (1978).

Exposure to asbestos dust may result in one of three diseases: asbestosis, a chronic disease of the lungs causing shortness of breath similar to emphysema; mesothelioma, a fatal cancer of the lining of the chest, abdomen or lung, and lung or other cancers. However, it is contended by Manville that it was not until recently that the full extent of the dangers due to asbestos exposure was clarified.[1] Thus, the enhanced safety programs which eventuated because of the new discoveries regarding the damages of asbestos were too late to have any effect on those who had previously been exposed. Accordingly, Manville expects a proliferation of claims in the next 30 years by those previously exposed who will manifest these diseases in this period.

An excursis into the various factors supporting this Court's conclusion that these future claimants possess at the very least a cognizable interest in this reorganization case follows. These factors include the applicability of Code Section 1109(b) regarding parties in interest and those insurance cases holding that a proper trigger for insurance coverage for claims liability is exposure to asbestos. Analysis also focuses on the statistical data relating to the proliferation of future asbestos claims submitted by Manville in support of its petition as well as

facts known and agreed to by all parties which dictate a finding that these claimants are parties in interest entitled to representation in this case. This excursis will conclude by exploring the kinds of entities which may be utilized to represent future claimants in these proceedings.

II. *Whether Or Not They Possess Cognizable Claims, Future Claimants Do Possess A Cognizable Interest In This Reorganization*

A. *Statistical Data Submitted by Manville Support A Finding Of Cognizable Interest On The Part Of Future Claimants*

From the inception of this case, it has been obvious to all concerned that the very purpose of the initiation of these proceedings is to deal in some fashion with claimants exposed to the ravages of asbestos dust who have not as of the filing date manifested symptoms of asbestos disease. Indeed, but for this continually evolving albeit amorphous constituency, it is clear that an otherwise economically robust Manville would not have commenced these reorganization proceedings. *See generally* Note, Manville: Good Faith Reorganization or "Insulated" Bankruptcy, 12 Hofstra L.Rev. 121 (1983). It should also be noted that there are suggestions in the vast record before this Court that Manville is not as economically sound as reputed. *See* footnote 2 in Decision No. 1 on correlated Manville matters accompanying this opinion. It is the spectre of proliferating, overburdening litigation to be commenced in the next 20–30 years, which litigation would be beyond the company's ability to manage, control, and pay for, which has prompted this filing.

In the affidavit of Manville officer James Beasley accompanying the filing pursuant to Additional Local Rule XI–2, Manville sets forth its reasons for seeking relief un-

---

1. Many of the asbestos victims, however, claim that Manville had knowledge of these dangers early on and nonetheless did not provide this information to its workers and did not take all known measures to protect these workers and others who came into contact with asbestos. These claimants therefore seek punitive damages against Manville in suits they brought prior to the Manville filing.

der Chapter 11. According to this affidavit, it is in great measure the impact of the future claimants which necessitates the filing. Beasley states:

Manville Corporation's Board of Directors, and a special committee appointed by the Board to oversee the review of the consultant's report, have concluded that the potential future impact on J–M, Manville and various other of the Debtors which are named or potential defendants of pending and future asbestos cases could and probably will exceed Manville's ability to pay and finance the continuing operation of Manville's businesses.

Beasley Affidavit at 7.

This projection by Manville has reportedly been based on the study by Epidemiological Research Institute ("ERI"), a consulting firm specializing in biostatistical research commissioned by Manville in response to an increase in the number of asbestos cases. According to the Beasley Affidavit, this increase is evidenced by the fact that as of June 30, 1983, the number of asbestos cases had increased by approximately 1,700 cases over the December 31, 1981 level of 9,300 cases. The level of cases on December 30, 1980 had been only 5,087 and during the first half of 1982, an average of approximately 495 new plaintiffs per month commenced an average of approximately 425 cases per month against Manville. Beasley Affidavit at 5. The ERI study commissioned in response to these statistics estimated that "a reasonable control projection of the number of lawsuits seen from 1982 on is likely to be about 45,000, with a reasonably firm lower bound of 30,000 and a very definitive upper bound on the order of 120,000. Projections of Asbestos Related Diseases 1980–2009, Final Report, August 2, 1982, at 27. *See also* Decision No. 1's discussion of Compendium submitted by Manville in opposition to the Asbestos Committee's motion to dismiss regarding the content of all of the statistical studies and deliberations leading up to the filing.

Beasley also reports that as of the filing, Manville had been found liable for punitive damages in ten asbestos suits and that $616,000 was the average award in each case. Beasley Affidavit at 6. One such reported case where an award of punitive damages was affirmed is *Moran v. Johns-Manville Sales Corp.*, 691 F.2d 811 (6th Cir. 1982).

The Beasley Affidavit concludes that based on an estimated cost of $40,000 per case, the total projected cost of the future suits could range anywhere between $2 billion and many times that amount over the next 20 years and potentially force the sale, liquidation or other disposition of Manville's assets and the dismemberment of its business. Beasley Affidavit at 7. Indications that the estimates of a lower bound of 30,000 cases costing $40,000 per case may have been too conservative can be found in a New York Times article regarding the increase in size of jury verdicts against the codefendants since the filing date. *See* New York Times, January 10, 1983, D–2, col. 1. *See also* footnote 2 in Decision No. 1 on correlated Manville matters regarding the conservatism built into the calculation of the $1.9 billion debt figure predicating the filing.

Accordingly, a resolution of the interests of future claimants is a central focus of these reorganization proceedings. Any plan emerging from this case which ignores these claimants would serve the interests of neither the debtor nor any of its other creditor constituencies in that the central short and long-term economic drain on the debtor would not have been eliminated. Manville might indeed be forced to file again and again if this eventuated. Each filing would leave attenuated assets available to deal with interests of emerging future claimants. Manville could also be forced into liquidation. The liquidation of this substantial corporation would be economically inefficient in not only leaving many asbestos claimants uncompensated, but also in eliminating needed jobs and the productivity emanating from an ongoing concern. It fosters the key aims of Chapter 11 to avoid liquidation at all reasonable costs.

As detailed in Decision No. 1 accompanying this opinion regarding the Asbestos

Committee's Motion to Dismiss, the drafters of the Code specifically built into it the concept of "open access to the bankruptcy process." *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 137, 95th Cong., 1st Sess. 75, 79 (1977). In addition, the drafters deliberately decided to eliminate the requirement that a debtor wait to file until its economic prospects are beyond salvation. *See id.* at 75. Accordingly, in order to resolve Manville's deep economic crisis, the rights of future claimants must be considered and represented at this crucial point in the reorganization case so as to avoid functional extinction of the debtor enterprise.

Indeed, in the final stages of preparation of this opinion, the Seventh Circuit issued its decision in *In re UNR Industries, Inc.,* 725 F.2d 1111, (7th Cir.1984), concerning a decision below denying the appointment of a legal representative for future asbestos claimants. Although the Seventh Circuit held that the issue was not ripe for appellate review, it did declare in dicta the importance of future claimants to any plan emerging from this kind of reorganization. The Seventh Circuit stated: "If future claims cannot be discharged before they ripen, UNR may not be able to emerge from bankruptcy with reasonable prospects for continued existence as a going concern." *Id.* at 1119.

B. *The Elastic Concept of "Party In Interest" and Section 1109(b) of the Code*

Section 1109(b) of the Code, 11 U.S.C. § 1109(b), makes clear that any "party in interest" may appear and be heard in a Chapter 11 case. It provides:

"Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, an equity holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

11 U.S.C. § 1109(b).

■ The term "party in interest" has no specific definition in the Code and its applicability must be determined on an *"ad hoc"* basis. *In re Penn Dixie Industries, Inc.,* 9 B.R. 941, 943 n. 7 (Bkrtcy.S.D.N.Y.1981). The Collier treatise states that this term must be construed broadly so that parties affected by a Chapter 11 case have an opportunity to be heard. *See* 5 Collier on Bankruptcy ¶ 1109.02 at 1109–22 to 1109–23 (15th ed. 1979). In addition, Colliers' Comment to this section states: "As in the case of Section 206 of the Act and Rule 10–210(a)(1) [predecessor provisions] section 1109(b) continues the broad concept of the absolute right to be heard in order to insure fair representation in the case and prevent excessive control by insider groups." 11 U.S.C. § 1109(b), Colliers Pamphlet Edition (1983).

Section 206 of the predecessor Act represented an effort to encourage and promote individual participation in reorganization cases by creditors and stockholders and to foster democratization of such cases. *See* House Hearings on H.R. 6439, 75th Cong., 1st Sess. 185 (1937); House Report No. 1409 on H.R. 8046, 75th Cong., 1st Sess. 47–48 (1937). The Third Circuit stated in an early decision: "In substituting Chapter X for section 77B Congress clearly intended to broaden the rights ... to participate in corporate reorganization proceedings." *In re Keystone Realty Holding Co.,* 117 F.2d 1003, 1005 (3d Cir.1941). Thus, courts declared that there was no need to seek intervention to obtain full participation in the reorganization by any creditor, stockholder or indenture trustee, or of a duly authorized creditors' or stockholders' committee since Rule 10–210(a)(1) gave every right that intervention could give. *See, e.g., In re Duplan Corp.,* 450 F.Supp. 790, 791 (D.C.S.D.N.Y.1978); 5 Collier on Bankruptcy ¶ 1109.02 at 1109–20.

Code Section 1109(b) continues the broadening of the concept of party in interest which began under the predecessor Act. Contrary to the position urged by counsel for Peter John Robinson, a self-styled future claimant, the listing of examples of

parties in interest in Code Section 1109 is not meant to exclude other types of interested parties from the purview of that section. As Colliers states: "Section 1109(b) does not limit who in a Chapter 11 case may be a party in interest. Section 102(3) states that the term 'including' is not limiting, and thus the use of the word 'including' in section 1109(b) does not limit 'party in interest' status to those parties referred to in the subsection." 5 Collier on Bankruptcy ¶ 1109.02 at 1109–22.

The Second Circuit has recently opined in limiting fashion on the broad concept of party in interest. However, the facts predi-

cating the Second Circuit's opinion in *In re Comcoach Corp.*, 698 F.2d 571 (2d Cir.1983), are wholly distinguishable from the instant facts. Indeed, Judge Haight in affirming this Court's opinion in *Commercial Union Insurance Co. v. Johns-Manville Corp., et al*, Bankr.L.Rep. (CCH) ¶ 69,215 (Bankr.S.D.N.Y.1983), held that *Comcoach* does not bar a true party in interest from participating in the Manville reorganization proceedings.[2]

■ While the precise contours of Code Section 1109(b) have yet to be fixed, they are certainly broad enough to embrace the interests of future claimants as affected

2. In *Comcoach,* the Second Circuit stated: "To qualify for the 'for cause' relief provided in section 362(d)(1), it is necessary that the party seeking such relief be a 'party in interest'. 11 U.S.C. § 362(d)." 698 F.2d at 573. The Second Circuit then considered whether the applicant for relief, the Roslyn Savings Bank, was a "party in interest" and concluded that it was not. The Circuit based its holding on the following facts: The bank held a mortgage on which it desired to foreclose, the mortgagor having defaulted on its payments. It instituted a foreclosure proceeding against the mortgagor in New York State Supreme Court. Comcoach, as the tenant in possession of the mortgaged premises, was neither named as a party defendant nor served with process. Thereafter, Comcoach filed a Chapter 11 petition and ceased paying rent. The bank believed it was barred from conducting the state foreclosure action pursuant to the automatic stay provision of the Code. It thus applied to lift the stay pursuant to Section 362(d)(1) to permit it to name the tenant as a defendant in the foreclosure action. The bankruptcy court and district court had held that the bank was not a "party in interest" in the bankruptcy case entitled to so move under the Code.

In affirming the decisions of the lower courts, the Circuit stated:

"Bankruptcy courts were established to provide a forum where creditors and debtors could settle their disputes and thereby effectuate the objectives of the statute. Necessarily, therefore, the Bank must be either a creditor or a debtor to invoke the court's jurisdiction." 698 F.2d at 573.

The court then characterized the standing of the bank as follows:

"Turning to the particular facts of this case, the Bank is clearly not a debtor. Nor is the Bank a 'creditor' of the bankrupt. The Code in pertinent part defines a creditor as an entity that has a claim against either the debtor or the estate, arising at certain specified times. 11 U.S.C. § 101(9)(A), (B) (Supp.

V 1981). A claim means a right to payment, id. at § 101(4)(A) (Supp. V 1981), or 'a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment,' id. at § 101(4)(B). The Bank here has no right to payment from the bankrupt, since the bankrupt has no obligation on the mortgage and the bankrupt's duty to pay rent on its lease runs only to Rhone, not the Bank. Moreover, the Bank lacks any right to equitable relief against the bankrupt arising out of a breach of performance giving rise to a right to payment. Consequently, the Bank possesses no claim against the debtor or the estate, lacks 'creditor' status, and cannot move to lift the automatic stay." *Id.* at 574. A pivotal factor in the Second Circuit's opinion was its conclusion that the bank could easily have obtained a remedy by applying for the appointment of a receiver in the state foreclosure action. A court-appointed receiver would qualify as a party in interest in privity with the debtor for the purposes of § 362(d). Whereas the bank had no relationship with the debtor-tenant in Comcoach except for the fact that the debtor happened to be the tenant of the defaulting mortgagor, the future claimants in this reorganization case are clearly in privity with the debtor. In fact, these claimants are the central focus of this case. Unlike the debtor in *Comcoach,* they have no alternative method of asserting their keen and compelling interest in this reorganization other than in the reorganization itself. In such a situation, Judge Haight stated he would be "reluctant" to deny a party standing unless compelled to do so by the precise holding in *Comcoach. See Commerce Union, CCH* ¶ 69,215 at 82,481. Just as the relationship of an insurance company to Manville is one that Judge Haight in *Commercial Union* declared confers standing on the insurance company to move regarding the scope of the automatic stay, the direct privity between the future claimants and Manville equally confers such standing.

parties. Future claimants are undeniably parties in interest to these reorganization proceedings pursuant to the broad, flexible definition of that term enunciated by the foregoing authorities. The drafting of "party in interest" as an elastic concept was designed for just this kind situation. As detailed above, future claimants are indeed the central focus of the entire reorganization. Any plan not dealing with their interests precludes a meaningful and effective reorganization and thus inures to the detriment of the reorganization body politic. Any meaningful plan will either provide funding for future claimants directly or provide for the continuation of some form of responsive, ongoing entity post-confirmation, from which to glean assets with which to pay them. If they are denied standing as parties in interest, they will be denied all opportunity either to help design the ship that sails away from these reorganization proceedings with their cargo on board or to assert their interests during a pre-launching distribution. *See* Decision No. 1 re GAF, Whitman and Co-defendant's Motions. In either event, the direct impact on these claimants will be enormous as declared by the Seventh Circuit in *In re UNR, supra. See* discussion of the dicta of the Seventh Circuit on the crucial nature of the interest of future claimants in this decision, *supra.* Thus, because none of the existing committees of unsecured creditors and present asbestos claimants represents this key group [3], a separate and distinct representa-

tive for these parties in interest must be established so that these claimants have a role in the formulation of such a plan. This is especially so given that any plan of reorganization must necessarily balance the rights and needs of prepetition creditors against the anticipated rights and needs of postpetition creditors with Manville's purportedly limited assets and further economic prospects apportioned accordingly.

### C. Since Exposure Triggers Insurance Coverage, These Putative Claimants Are Parties In Interest

■ Another basis for this Court's holding that the future claimants are a wholly cognizable constituency as parties in interest under Section 1109(b) is that the vast majority of courts considering the issue have held that mere exposure to asbestos triggers insurance coverage. *See Insurance Co. of North America v. Forty Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir.1980) *aff'd on rehearing,* 657 F.2d 814 (6th Cir. 1981), *rehearing denied,* 455 U.S. 1009, 102 S.Ct. 1648, 71 L.Ed.2d 878 (1982). *See also Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); *Porter v. American Optical Co.,* 641 F.2d 1128 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (where the courts decided that both exposure and manifestation trigger coverage under comprehensive general liability policies). *But see Eagle-Picher*

---

**3.** At first blush, future interest advocacy would seem to be the province of the Committee of Asbestos Health Related Litigants and/or Creditors. However, that group, appointed by the United States Trustee for this district, is composed almost exclusively of lawyers representing present health liability claimant-victims. Recently, on October 31, 1983, at this Court's urging, James Vermuelen, an asbestos health claimant, was added to the Committee. The other lawyer members of the Committee as a group have their own financial interests in the proceedings emanating from their contingency fee arrangements with their existing clients. Perceiving that their stake in maximizing recovery from the reorganizing Manville may be antithetical to the expectations of future interests, they have heretofore understandably asserted that they needed to restrict their collec-

tive focus upon their own parochial interests. In connection with this motion, they now cavalierly assert, without dealing with the conflict of interest issue, that if future claimants are to be represented in these proceedings, their committee should represent future claimants. However, such representation indeed has the potential for being inadequate given this conflict of interest problem.

In addition to Keene, it is only Manville, undoubtedly motivated by its own economic imperatives dictated by the spectre of a post-petition reorganization coexistence with emerging claims, that has professed concern with the need for a present accommodation of future interests. However, this skewed and less than robust advocacy by Manville is not acceptable. Hence, an independent representative for future claimants is essential.

*Industries v. Liberty Mutual Insurance Co.,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983). The *Eagle-Picher* decision holding that manifestation triggers coverage is distinguishable on its own facts from the Manville case. First, the insured itself urged a manifestation theory. Second, the First Circuit did not consider evidence relating to industry custom and usage because Eagle-Picher and its carriers stipulated that the policies were not ambiguous.

It follows logically that if exposure triggers a sufficient interest on the part of future claimants to warrant insurance coverage, then this same exposure should *a fortiori* justify a declaration that they are parties in interest to be impacted by these proceedings. As background, it should be noted that the controversy regarding the appropriate trigger for insurance coverage is part of the major litigation which Manville and other asbestos defendants are embroiled in with their insurance carriers. These carriers, approximately 25 in number who wrote approximately 100 policies for Manville, have by and large refused to provide defense and indemnity to Manville in asbestos cases. Manville asserts that its inability to look to at least $600 million in insurance coverage is a major factor in its decision to seek Chapter 11 relief. *See also* Background to Decision No. 1 accompanying this opinion. The insurance companies have created two inconsistent theories of insurance coverage by which they interpret their standard insurance policy language. It thus appears that those companies which sold coverage when the asbestos plaintiffs were manifesting symptoms advocate an exposure theory of coverage, whereby they contend that only the policies in force at the

earlier point of exposure apply. Those companies which sold policies at the earlier time of exposure generally advocate a manifestation theory, contending that the single policy in effect when a claimant manifested symptoms is the only source of coverage. In fact, one court has noted that the switching of positions by the insurance industry to suit their economic needs is among the reasons for rejection of the manifestation theory. *See Insurance Co. of North America v. Forty Eight Insulations, Inc.,* 451 F.Supp. 1230, 1239 (E.D.Mich.1978).

Most recently, a New York State Supreme Court has used the precedent of *Keene* and *Forty-Eight Insulations, Inc.* in denying a summary judgment motion on the theory that exposure to lead poisoning, another disease with a latency period, may be an "occurrence" sufficient to trigger insurance coverage. *See Allstate Insurance Co. v. Colonial Realty Co.,* N.Y.L.J. 11/15/83 at 14, col. 5 (Sup.Ct.Kings Cty. November 1983).

A major argument advanced in *In re Amatex Corp.,* 30 B.R. 309 (Bkrtcy.E.D.Pa. 1983), Adopted No. 6011. (E.D.Pa. filed Nov. 9, 1983), where the court held that future claims are not cognizable in bankruptcy was that courts in most states date the statute of limitations from the point of manifestation, *see e.g., Fusco v. Johns-Manville Corp.,* 643 F.2d 1181 (5th Cir.1981); *Karjala v. Johns-Manville Products Corp.,* 523 F.2d 155 (8th Cir.1975). This fact, however, does not vitiate the status of future claimants as parties in interest to this bankruptcy. Unlike the trigger of insurance coverage at the point of exposure, the fixation of a statute of limitations is totally unrelated to the status of future claimants as parties in interest.[4] In *Amatex,* the

**4.** Along these lines, it is clear (at least in the Manville case) that state-created statutes of limitation, which differ widely from state to state, if applied as a bar to recovery must yield to one nationwide uniform standard for claims allowability in bankruptcy. Otherwise, future claimants, who are parties in interest in this reorganization, in a state like New York, which dates the statute for asbestos claims from point of exposure, would be barred from asserting their claims, while future claimants in states

like Virginia or Wisconsin, which date these claims as of various points of manifestation, could assert such claims. *Compare Steinhardt v. Johns-Manville Corp., supra* (claim accrues at time of initial harmful exposure) *and Braswell v. Flinkote Mines, Ltd., supra* (construing Indiana law and holding that claim accrues at time of initial harmful exposure) *with Large v. Bucyrus-Erie Co.,* 524 F.Supp. 285–87 (E.D.Va. 1981) (following *Locke v. Johns-Manville Corp.,* 221 Va. 951, 275 S.E.2d 900 (1981) (hold-

debtor stipulated to one witness' opinion that all states date asbestos causes of action

from the point of manifestation. *See Amatex, supra,* 30 B.R. at 311. The *Amatex*

ing that claim accrues when medical condition begins) and *Neubauer v. Owens-Corning Fiberglass Corp.,* 686 F.2d 570, 577 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983) (applying Wisconsin law that claim accrues when disease is medically diagnosable). *See also Nolan v. Johns-Manville Asbestos Magnesea Materials Co.,* 85 Ill.2d 161, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981) (claim accrues when plaintiff knows or by reasonable diligence should know of the injury and that the injury was caused by the wrongful act of another); *Pauley v. Combustion Engineering, Inc.,* 528 F.Supp. 759, 764 (S.D.W.Va.1981) (summarizing various formulations). *See generally Wilson v. Johns-Manville Sales Corp.,* 684 F.2d 111, 115–16 (D.C.Cir.1982) (noting the variety of different formulations used in different states). Because a significant number of future claimants would be so barred without this uniform measure, this reorganization cannot ultimately succeed without such measure embodied in any reorganization plan.

Although bankruptcy courts have looked to state law for guidance in, *e.g.,* determining the enforceability of a claim, *see In re Spanish Trail Lanes, Inc.,* 16 B.R. 304, 306 (Bkrtcy.D. Ariz.1981); *In re Bowers,* 16 B.R. 298, 302 (Bkrtcy.D.Conn.1981), bankruptcy courts are federal courts with original and exclusive jurisdiction over bankruptcy cases under Article I of the United States Constitution and are thus not inalienably bound to enforce state law. *See* U.S. Const. Art. 1, § 8, cl. 4; *In re Bowers,* 16 B.R. 298, 302. *See generally In re Taddeo,* 685 F.2d 24 (2d Cir.1982), where the Second Circuit held that although state law requires payment of a mortgage in its entirety when accelerated, a debtor may cure in bankruptcy by paying only the amount of the default at issue. In so exercising its discretion, a bankruptcy court is not vitiating state created rights, but rather is determining their enforceability.

The United States Supreme Court in *Heiser v. Woodruff,* 327 U.S. 726, 732, 66 S.Ct. 853, 855, 90 L.Ed. 970 (1946), similarly articulated a bankruptcy court's inherent power to determine whether to enforce state claims, declaring:

> In passing upon and rejecting or allowing the proof of claim in this case the court of bankruptcy proceeds—not without appropriate regard for rights acquired under state law—under federal statutes which govern the proof and allowance of claims based on judgments. In determining what judgments are provable and what objections may be made to their proof, and in determining the extent to which the inequitable conduct of a claimant in acquiring or asserting his claim in bankruptcy requires its rejection or its subordination to

other claims which, in other respects are of the same class, the bankruptcy court is defining and applying federal, not state, law. Id.

In other instances where bankruptcy courts have looked as they should to state law for guidance in determining the enforceability of a claim, these courts have recognized their latitude in using equitable powers to decide to allow or disallow a claim. *See, e.g., In re Spanish Trail Lanes, Inc.,* 16 B.R. 304, 307. ("To effectuate the purposes of the Bankruptcy Code in successfully rehabilitating distressed debtors while at the same time treating creditors in a fair and equitable manner, bankruptcy courts must broaden their vision to include not only applicable state law, but the circumstances surrounding the claims in question.") *See also In re UNR, supra,* at 1120 where the Seventh Circuit declared in dicta that despite any finding of lack of cognizability of a claim, if this should occur, "a bankruptcy court's equitable powers ... just might be broad enough to enable the court to make provision for future asbestosis claims against the bankrupt when it approved the final plan of reorganization"; *In re Bowers,* 16 B.R. at 302 ("State law is utilized only to determine if the creditor holds a claim, not how and what claims shall be allowed."). *See generally* cases cited on the preemptive capacities of the bankruptcy court in footnote 6 *infra. See also* discussion contained in *In re Beck Industries, Inc.,* 725 F.2d 880, at p. 891 (2d Cir.1984), re the interplay of federal and state law as applied to claims in bankruptcy.

Accordingly, there is great justification for a bankruptcy court to authorize a uniform standard specifying some form of disease manifestation as the point of health claim allowability. This will avoid the unfairly inconsistent results which would otherwise eventuate in applying multitudinous statutes of limitations to like claims.

This Court believes it is imperative that such a nationwide standard declare that for purposes of allowability, a claim accrues, measured in some form from the point of discovery or manifestation of the disease in conformity with the great weight of authority favoring this position and the logic contained therein. *See, e.g., Neubauer v. Owens-Corning Fiberglass, supra* (construing Wisconsin law); *Nolan v. Johns-Manville, supra* (construing Illinois law); *Coyne v. Porter-Hayden Co.,* 286 Pa.Super 1, 5, 428 A.2d 208, 210 (1981); *Louisville Trust Co. v. Johns-Manville Products Corp.,* 580 S.W.2d 497, 501 (Ky.1979); *Harig v. Johns-Manville Products Corp.,* 284 Md. 70, 77–80, 394 A.2d 299, 304–06 (1978); *Hutchinson v. Semler,* 227 Or. 437, 446,

court relied on this stipulated testimony to reach its conclusion that future claims are not cognizable in a reorganization. *Id.* at 315.

First, it should be noted that not all states date the statute of limitations from point of manifestation. New York and Indiana law have been construed to date their asbestos inhalation actions for statute of limitations purposes not from the point of manifestation of disease, but rather from the point of exposure or inhalation of the toxic substance. *See Steinhardt v. Johns-Manville Corp.,* 54 N.Y.2d 1008, 446 N.Y.S.2d 244, 430 N.E.2d 1297 (1981) (construing New York law), *appeal dismissed,* 456 U.S. 967, 102 S.Ct. 2226, 72 L.Ed.2d 840 (1982); *Braswell v. Flintkote Mines Ltd.,* 723 F.2d 527 (7th Cir.1983) (construing Indiana law). Interestingly, the Seventh Circuit in *In re UNR, supra* declared in dicta that future claims should probably thus be cognizable in New York and Indiana articulating:

> In any event, some at least of the many thousands of workers who have been exposed to asbestos sold by UNR must have been exposed in states such as Indiana and New York where the cause of action accrues upon inhalation, and their claims against the bankrupt estate—accrued

361 P.2d 803, 807, *rehearing denied,* 362 P.2d 704, 704 (1961).

The logic followed by this line of cases involving latent diseases from toxic substances is consistent with the philosophy espoused by the California Court of Appeals in *Martinez-Ferrer v. Richardson-Merrell, Inc.,* 105 Cal.App.3d 316, 323, 164 Cal.Rptr. 591, 595 (1980). In applying a discovery rule where an injury caused by a drug manifested itself sixteen years after the drug was last ingested, the court explained:

> The simple fact is that rules developed against the relatively unsophisticated backdrop of barroom brawls, intersection collisions and slips and falls lose some of their relevance in these days of miracle drugs with their wondrous, unintended, unanticipated and frequently long-delayed side effects.
> ... 'The response of the courts [to advances in science and technology] can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs.' *Sindell v. Abbott Laboratories* (1980)

tort claims—*would appear uncontroversially to be provable in bankruptcy.*
At 1119 (emphasis added).

Second, that a majority of jurisdictions date the statute of limitations from the point of manifestation of the disease should not have the unintended effect of barring those who have not as yet manifested disease from asserting their status as parties in interest in this bankruptcy proceeding. This is because the policy reasons underlying the fixation by each state of a point from which to date a limitations statute are wholly different from those governing a bankruptcy court's finding that those who have not yet manifested symptoms of the disease are parties in interest in the case. The Supreme Court in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) articulated the policies served by a statute of limitations, declaring:

> Statutes of limitation which 'are found and approved in all systems of enlightened jurisprudence' ... represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of state claims in time comes to prevail over the right to prosecute them'.... These

26 Cal.3d 588, 610, 163 Cal.Rptr. 132, 144, 607 P.2d 924, 936.

The case of latent harm caused by ingestion of a drug which at the time of ingestion was thought to be safe is closely analogous to inhalation of asbestos dust which may also not have been widely known to be dangerous at the time most of the inhalation at issue took place. A statute of limitations which dates accrual of a claim from the point of unknowing exposure is equally antiquated and inapposite in both cases. The dissent in *Braswell v. Flintkote, supra,* citing the California Court of Appeals in *Martinez-Ferrer,* stated with compelling exasperation, and this Court agrees, that such a statute of limitations creates a "mockery of justice" because if an asbestosis claimant brought an action for immediate compensation before any manifestation of the disease, the claimant would be "laughed out of court". *See Braswell v. Flintkote, supra,* at 533 (Swygert, J. dissenting). On the other hand, were such claimant to wait until manifestation of the disease, he would be forever barred from compensation. *Id.*

enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

*Id.* at 117, 100 S.Ct. at 356 (citations omitted).

Thus, the fixation of the point from which to date a statute of limitations includes an assessment of the general need for repose against the need for redress of injury. In contrast, the assessment of whether future claimants are parties in interest is an *ad hoc* determination of the potential detriment to these parties which nonrepresentation would work.

In any event, the factors militating in favor of declaring future claimants parties in interest are more akin to those factors which prompted a majority of courts to hold that exposure is an appropriate trigger to insurance coverage than to those considered in fashioning an appropriate statute of limitations. The Seventh Circuit in *UNR, supra* stated in dicta that the state law policy reasons justifying the postponement of tort claim accrual to manifestation relate in no way to a desire to disenfranchise future claimants:

> Even in a "discovery" state the cause of action may "exist" before it "accrues"—that is before the statute of limitations on bringing it begins to run . . . . These states postpone the date of accrual of the cause of action not in order to prevent the early filing of claims but in order to lift the bar of the statute of limitations to later filings".

At 1119. In addition, the Sixth Circuit in its opinion in *Insurance Co. of North America, supra,* affirming and modifying its earlier holding that a trigger for coverage is exposure, reiterated its reasoning that "bodily injury" occurs when an asbestos victim first starts breathing asbestos fibers. *See Insurance Co. of North America,* 657

F.2d at 816. Similarly, the District of Columbia Circuit Court of Appeals declared in *Keene, supra,* that the term "bodily injury" in comprehensive liability policies means "any part of the single injurious process that asbestos-related diseases entails." *See Keene,* 667 F.2d at 1047.

In the instant case, this comprehensive definition of bodily injury covering mere exposure militates in favor of a declaration that those who have been exposed to asbestos prepetition and have manifested or will manifest disease post-petition are parties in interest to this reorganization case. *See also Commercial Union Insurance Company v. Pittsburgh Corning Corp.,* 553 F.Supp. 425, 433 (E.D.Pa.1981), in which the district court construed the coverage provisions of an excess insurance policy for liabilities relating to alleged asbestos injuries. Faced with a conflict between exposure and manifestation theories under Pennsylvania law, the district court concluded:

> For the reasons which follow, I hold in favor of an exposure theory based on either of two simple, uncontroverted, and indisputable facts: (1) asbestos disease is cumulative; and (2) some microscopic damage occurs before manifestation of the injury. *See, e.g. Insurance Co. of North America v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212, 1214 (6th Cir. 1980), *petition for cert. filed* 50 U.S.L.W. 5023 (U.S, July 31, 1981) (No. 81–198). By the former, I mean that asbestos diseases are caused by an accumulation over time of asbestos particles in the body. Particles accumulated during exposure, but before manifestation of an asbestos disease, are a cause-in-fact of the disease. The second fact statement is self-explanatory.
>
> *Id.*

Thus, this policy underlying the finding that mere exposure triggers coverage likewise militates in favor of a declaration that future claimants are parties in interest.

D. *Prior Holdings Are Not at Odds With a Finding That Future Claimants Are Parties In Interest*

In holding in favor of the appointment of a legal representative for future claimants,

this Court is not unmindful of the decisions of two courts faced with similar problems, *In re UNR Industries,* 29 B.R. 741 (D.C.N.D. Ill.1983), and *In re Amatex Corp., supra.* In *Amatex,* Bankruptcy Judge King submitted an advisory report and recommendations to the district court declaring that future claims are not cognizable in bankruptcy, which findings were adopted by the district court. The *Amatex* decision is currently on appeal. Similarly, in *UNR,* District Judge Hart held that future asbestos-related health claims are not dischargeable in bankruptcy. As noted *supra,* the Seventh Circuit in *In re UNR, supra* only a few days ago and during the final drafting of this opinion dismissed the appeal, holding that the issue of appointment of a legal representative is not yet ripe for appellate review because neither a plan proposing to discharge future claimants nor a proof of claim which can be objected to has been filed in the case. However, the Seventh Circuit as described and quoted *supra* did in dicta declare the nature of the keen interest of future claimants in the reorganization. In so stating, the Circuit also declared the primacy of "a bankruptcy court's equitable powers" even in the face of a finding (non final) that an unaccrued tort claim is not a cognizable claim in bankruptcy. At 1119. It should be noted that unlike in *UNR,* in the Manville case, it appears that at least several claims by future claimants have been filed.

First, although some of the statements in dicta by the Seventh Circuit in *UNR* may be interpreted to favor the dischargeability

of future claims, it is unnecessary for this Court to face the dischargeability issue at this time in order to decide whether these claimants are parties in interest. In fact, this Court may never be faced with deciding the dischargeability issue since Manville's currently proposed nonconsensual plan intends to treat future claims as nondischargeable. This plan impacts on future claimants only in a *de facto* manner in shaping the claims estimation process and the residue Manville entity that will emerge post-confirmation. That is not to say that during the course of these proceedings a plan confronting dischargeability of future claims will never be filed.[5] Or, this group may be considered as a distinct, cognizable, certifiable class in light of the *Agent Orange* opinion dealing with mass exposure to a toxic substance. *See* footnote 6, p. 754 *infra.* In any event, the concept of "party in interest" is an elastic and broad one designed to give a Court great latitude to insure fair representation of all constituencies impacted in any significant way by a Chapter 11 case.

■ In contrast, the concept of dischargeability of claims cognizable in the reorganization may require a showing that due process has been achieved in binding unknown putative claimants to a plan of which they may or may not have had notice. Thus, Judge Hart's pronouncement that the contingent claims of future asbestos claimants are not cognizable in bankruptcy for dischargeability purposes because they are grounded in tort instead of contract law, whether correct or incorrect[6], is not binding

---

**5.** In the event that such a plan is proposed, the expression by this Court in favor of the cognizable nature of future claims, *see* footnote 6 *infra,* could well become central to a determination by this Court on this issue.

**6.** It is the view of this Court that the declarations by Judges Hart and King that these future claims are nondischargeable in bankruptcy are based on superannuated and considerably narrow notions of what constitutes a claim dischargeable in bankruptcy. These notions are at odds with the expanded definition of "claim" contained in Section 101(4) of the Code. In enacting the Bankruptcy Code, Congress specifically intended to afford the broadest possi-

ble scope to the definition of "claim" so as to enable Chapter 11 to provide pervasive and comprehensive relief to debtors. The legislative history of Section 101(4) explains:

> The effect of the definition [of claim] is a significant departure from present law [under the former Bankruptcy Act]. Under present law, 'claim' is not defined in straight bankruptcy. Instead it is simply used, along with the concept of provability in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of [the Bankruptcy Code] far more broadly. *The definition in paragraph (4) adopts an even broader definition of*

on this Court's determination of whether these claimants are parties in interest. He

> claim.... *The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured....* The definition also includes as a claim an equitable right to performance that does not give rise to a right to payment. *By this broadest possible definition, and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill [Bankruptcy Code] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.*

House Report. No. 95–595 to accompany H.R. 8200 95th Cong. 1st Sess. 309 (1977), pp. 308–314, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6265–6271 (emphasis supplied).

In this reorganization case, that a vast group of future claimants will exist is a statistical certainty, with projections differing only as to the precise quantity and size of these claims. These claims were and remain the *raison d'etre* for the filing here. Accordingly, the *Amatex* and *UNR* Court refusal to declare future claims cognizable in bankruptcy not only ignores the reality of their existence and importance, but also runs contrary to Congress' intention in drafting Code Section 101(4) that all obligations of the debtor should be dealt with in a Chapter 11 case.

Accordingly, Movant Whitman's citation in support of its motion to dismiss determined in Decision No. 1 to *In re Gladding Corp.,* 20 B.R. 566 (Bkrtcy.D.Mass.1982), is inapposite in that it is a pre-Code decision governed by antiquated concepts of provability of claims and the Act's less expansive definition of "claim". Also, *Gladding* is distinguishable from Manville on its facts. The future contingent products liability claims involved in *Gladding* were not the *raison d'etre* for the filing and thus unlike in *Manville* there could more readily in *Gladding* than in *Manville* be a viable reorganization without the consideration of future claimants. It is also noteworthy that Judge Hart's assertion that the determination of whether a claim is cognizable depends on state law may contravene the Constitutional requirement of uniformity in the laws of bankruptcy. In fact, the Seventh Circuit's pronouncement in dicta in *UNR* this week as detailed *supra* notes the preeminence of a bankruptcy court's equitable powers in enforcing otherwise unenforceable state law tort claims. *See* p. 1119.

Furthermore, under the Bankruptcy Code, if state law notions so narrow the definition of a "claim" as to frustrate the stated objective of providing the debtor the broadest possible relief, state law must yield to an overriding federal construction. *Cf. Chicago Board of Trade v.*

declares: "The Court is not unaware that in refusing to approve of a procedure by which

*Johnson,* 264 U.S. 1, 10, 44 S.Ct. 232, 234, 68 L.Ed. 533 (1924) (property rights are generally regulated by state law, but "when the language of Congress indicates a policy requiring a broader construction of the [bankruptcy] statute than the state decisions would give it, federal courts cannot be precluded by them"); *Pierro v. Taddeo (In re Taddeo),* 685 F.2d 24 (2d Cir.1982) (bankruptcy court could cure defaults and authorize "de-acceleration" of mortgage and reinstate original payment schedule irrespective of conflicting state law); *In re Gladstone Glen,* 628 F.2d 1015 (7th Cir.1980) (Illinois characterization of beneficiary's interest in land trust as personal property is not controlling for purposes of filing petition for relief as "debtor" under Chapter XI of Bankruptcy Act); *Coldwell Banker & Company v. Godwin Bevers, Inc. (In re Godwin Bevers, Inc.),* 575 F.2d 805 (10th Cir.1978) (fully performed listing contract which may have been executory under California law only gives rise to a provable, contingent unsecured claim for bankruptcy purposes); *Official Cattle Contract Holders Committee v. Commons (In re Tedlock Cattle Company),* 552 F.2d 1351 (9th Cir.1977) (notwithstanding California law providing benefit-of-the-bargain damages, bankruptcy trustee could properly apply overriding federal law and apportion assets under equitable cash-in-cash-out theory). *See also* cases cited in note 4 *supra* regarding the impact of state created rights on bankruptcy court's discretion as to enforceability of those rights.

Moreover, the problem of sufficient notice of the impact of these proceedings on these putative claimants alluded to by the lower courts in *UNR* and *Amatex,* and raised by some of the movants herein, while difficult in the extreme, is a logistical one which can be handled by resort to innumerable media tools now available in our electronically aware society for use by the representative of future claimants. Indeed, in the somewhat analogous situation of representations of yet unborn claimants, courts have sanctioned the appointment of a legal representative. *See, e.g., Hatch v. Riggs National Bank,* 361 F.2d 559, 565–66 (D.C.Cir. 1966). And, the Seventh Circuit in *UNR, supra,* although in dicta terming the notice problem "formidable" and "possibly insurmountable", goes on to explore various ways by which these claims may be declared cognizable in bankruptcy. At 1118.

The First Circuit in *In re DCA Development Corp.,* 489 F.2d 43, 46 (1st Cir.1973), declared that under the Act, the notice requirements simply required "such notice and an opportunity for a hearing as is reasonable and appropriate in each particular case". With reference to the Supreme Court's landmark decision in *Mullane v. Central Hanover Bank & Trust Co.,* 339

the rights of putative claimants would be adjudicated and cut off, the putative claimants may wind up with judgments against corporations left with only one asset: a corporate charter." *In re UNR,* 29 B.R. at 748. Thus, even Judge Hart recognizes the probability of significant detriment which future claimants will suffer if not provided for either directly within the reorganization itself or indirectly, by restructuring the company in such a way as to provide more than a mere corporate charter with which to pay these claims.

Similarly, Bankruptcy Judge King in *Amatex* declares: "The debtor argues persuasively that a guardian is necessary to protect these interests on the basis that if the company fails to rehabilitate itself and is liquidated, these claims will have no recourse against any future fund." *In re Amatex,* 30 B.R. 309, 10 B.C.D. 955, 960. Judge King then goes on to note that he can conceive of no way in which a guardian could improve the business climate so as to guarantee the survival of the company. Such observation appears to this Court to be limited merely to Judge King's individual assessment concerning the *Amatex* case of the effectiveness of such a guardian in representing the interests of those affected parties. However, his statements are not contrary to the concept of future claimants as parties in interest with a real stake in the current case.

U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950), the First Circuit in *DCA* continued: "The court in each case must balance the individual's interest in adequate protection against the overall interest of efficient, final resolution of claims". *DCA,* 489 F.2d at 46. The *DCA* court also stated that "even where formal notice to affected parties is omitted or is insufficient, informal or constructive notice which provides them with the same opportunity for a fair hearing can satisfy the procedural requirements of the Bankruptcy Act." *Id.* at 47. *See also In re GAC Corp.,* 681 F.2d 1295 (11th Cir.1982), where the Eleventh Circuit held that a mailing to approximately 280,000 potential claimants and a publication of the order suffice as adequate notice comporting with due process requirements. The *GAC* Court so held, citing *Mullane, supra,* and declaring that adequate notice is that which is reasonably calculated under all the circumstances to afford interested parties an opportunity to be heard. *Id.* at 1300.

These cases demonstrate that the bankruptcy court must balance the need for individual notice against the need for moving forward to facilitate a reorganization plan. Under the Code, this elastic concept of notice would seem to remain unchanged because the court is given discretion in establishing the time within which proofs of claim must be filed as well as the form of notice informing creditors of the proceeding. *See* Rules of Bankruptcy Procedure 3003(c)(3); Code Section 342.

In light of these cases, the burden of solving the logistical problem of notice in the *Manville* case does not outweigh the burden on all constituencies should this essential constituency be denied its rightful consideration in these proceedings. Should future claimants be denied all consideration, it is likely that the petition would be dismissed and the debtor would be forced to liquidate to the detriment of the asbestos victims. This is especially so given the intense publicity surrounding every aspect of Manville's filing which potentially has already gone and will continue to go a long way toward giving notice to putative claimants. Also, since notice is an elastic concept, nothing would prevent this Court from requiring supplemental publications and/or mailings at a later date should it appear that the number of claims filed differs markedly from statistical projections.

Indeed, Judge Weinstein in *In re Agent Orange Product Liability Litigation,* —— F.R.D. ——, MDL No. 381, Memorandum And Pretrial Order No. 72 (E.D.N.Y. December 16, 1983, *writ of mandamus denied,* 725 F.2d 858, 2d Cir., 1984, *cert. pending* ), faced and surmounted similar notice difficulties in certifying a class of victims of Agent Orange exposure. In so binding this evolving group of claimants to a singular future determination of liability, Judge Weinstein creatively fashioned a most specific and concrete system of notice-giving which he deemed "the best reasonable and practicable notice under the circumstances of this litigation." *Agent Orange* Memorandum, at ——. This notice includes notification by mail to all present litigants, newspaper and magazine advertisements, television and radio spots, mailings by the governors of every state pursuant to Vietnam Veterans listings, and an "800" telephone number to be manned daily to give information to potential claimants as to where to write for further information.

Judge Weinstein's decision also supports the general concept of dealing with a multitudinous group of victims exposed and damaged in different ways one to the other on a class basis. Oral argument on the appeal of this decision before the Second Circuit was heard on January 4, 1984 and the Second Circuit denied defendants' request for a writ of mandamus on January 9, 1984. Thus, Judge Weinstein's decision presumably remains in full force and effect.

Moreover, further evidence that no plan of reorganization for Manville is feasible and none can be confirmed without some direct or indirect, *de jure* or *de facto* consideration of the future claims issue is found in the report of an Examiner appointed in the *UNR* bankruptcy case. Indeed, the *UNR* Examiner, in his preliminary report rendered on April 22, 1983, subsequent to Judge Hart's decision denying the appointment of representative for future claimants, declared:

> Regardless of whether or not the unknown claims can be barred in these proceedings, it is important that they be determined as accurately as possible before any decision can be made about the future of the debtors. It would be difficult to determine if any plan would be feasible unless some estimate is made of claims that would not be discharged by the proceedings.

UNR Examiner's Preliminary Report, p. 10.

This court has been informed that as a result of this report, the bankruptcy court involved in the *UNR* case has authorized a study of future claims and that Judge Hart has refused to intervene except to recommend that the examiner consider the data contained in Manville's ERI Study.

It is thus the unprecedented, extraordinary nature of these proceedings that mandates a declaration that these claimants are parties in interest under Code Section 1109(b) in need of a legal representative to act independently and impartially where appropriate in the case. The participation of such a representative is especially important to the development of any plan, consensual or otherwise, which will include the formulation of claims estimation procedures. Such appointment is also grounded on the Court's pervasive equitable powers emanating from Section 1481 of Title 28, U.S.Code and Section 105(a) of the Bankruptcy Code. These equitable powers are vested in this Court specifically to enable it to respond to extraordinary problems in estate administration consistent with the statutory goals of Chapter 11 of Title 11 U.S.C.

The fact that one plan has already been filed without the participation of a future interest constituency is not truly relevant. In this case, it is quite probable that the first-filed plan will only form the basis for intense negotiation aimed at forging a consensual confirmable plan or failing that, an imposed plan. In fact, representatives for both the Asbestos Committee and Manville reaffirmed their desire to effect a consensual plan at the hearing on November 21, 1983 where Manville filed its plan. The empty chair in these proceedings can and must be filled to give this affected group more than the empathetic consideration it currently receives from the other participants in the reorganization.

Much of the opposition expressed by the constituencies in this case is concerned with the mechanical difficulties of appointment, *i.e.*, the fairness of a single representative, or the lack of a specifically defined role. The Unsecured Creditors Committee argues that if a representative can be appointed, it should not be a solitary representative, but rather a committee of persons representing this group. *See* 11 U.S.C. § 1102. The Equity Committee takes the position that if future claims are to be dealt with, the appointment of a legal representative at this time would serve no tangible objective because it is only when Manville seeks an inevitable injunction prohibiting future claimants from asserting their claims against an asset-shielded post-confirmation entity that this representative's function is no longer amorphous. This statement exhibits the Equity Committee's basic belief that a legal representative for future claimants is appropriate to the reorganization process. The Committee only differs from Keene and Manville on the timing of such appointment.

### E. *Some Kind of Representative Is Appropriate In the Instant Case*

The concept of the appointment of some kind representative for parties in interest whose identities are yet unknown is not unprecedented. The power to appoint such a representative is inherent in every court.

*See, e.g., Smith v. Lamb,* 103 Ga.App. 157, 118 S.E.2d 924 at 927 (1961); *In re Viehman's Estate,* 47 Ill.App.2d 138, 197 N.E.2d 494 (1964). In *Gunnell v. Palmer,* 370 Ill. 206, 18 N.E.2d 202 (1938), the court responded to the appointment of a trustee to represent the interests of unborn descendants of the Gunnells without precise statutory authority therefore, stating:

> This court has held, in chancery cases, that the doctrine of representation must have the flexibility born of convenience and necessity, and that if the interests of unborn contingent remandermen are sufficiently represented so they can be protected by the court, the prerequisites for application of the doctrine are satisfied. *Hale v. Hale,* 146 Ill. 227, 33 N.E. 858, 20 L.R.A. 247; *Longworth v. Duff,* 297 Ill. 479, 130 N.E. 690; *Denegre v. Walker,* 214 Ill. 113, 73 N.E. 409, 105 Am.St.Rep. 98, 2 Ann.Cas. 787; *Montgomery v. Equitable Life Assurance Society,* 7 Cir., 83 F.2d 758.

18 N.E.2d at 204.

Describing the handling of tort claims in another railroad case, F.C. Underhay reported that in the 1932 receivership of the Interborough Rapid Transit Company, the court sanctioned the appointment of a "Tort Creditors' Committee" to safeguard the interests of present and future claimants which arose before and during the receivership. Underhay, *Tort Claims in Receivership and Reorganization,* 22 Iowa L.Rev. 60, 77–80 (1936). At the time of the receivership, 3157 negligence actions were pending in state or city courts and 1747 claims had been filed with the company. *Id.* at 79. Actions continued to be brought and claims were filed until August 1933, when the number of claims filed peaked at 3313. *Id.*

The foregoing decisions demonstrate that where circumstances warrant, courts readily use their equitable powers to protect the substantive rights of persons similarly situated who are not before the court.

The instant case presents an even stronger legal basis for the appointment of some kind representative in that there is present here the statutory basis of Code Section 1109(b) regarding parties in interest.

This Court herewith considers in preliminary fashion several formulations of legal representation: guardian ad litem, amicus curiae and examiner.[7] These alternative forms of representation are no more than

---

**7.** *Guardian Ad Litem*

By appointing a *guardian ad litem,* this Court may avoid the necessity of making all persons who are represented in an action parties to that action. These claimants would be bound by the actions of that guardian by virtue of the doctrine of equitable virtual representation. *See* 30A C.J.S. Equity § 145(a)(1), which explains: "This doctrine, tersely stated, is to the effect that where it appears that a particular party, although not before the court in person, is so far represented by others who are before the court that his interests receive actual and efficient protection, his actual joinder may be dispensed with, and the decree may be held to be binding on him." *Id.* This doctrine justifies the appointment of a *guardian ad litem* or a trustee for unknown entities where there exists an immediate need to proceed to a determination affecting these unknown entities in order to determine the rights of present parties. *See, e.g., Hatch v. Riggs,* 361 F.2d 559 (D.C.Cir. 1966); *Peoples National Bank v. Barlow,* 235 S.C. 488, 112 S.E.2d 396 (1960); Trusts, *Modification of Irrevocable Trusts Through Appointment of a Guardian for Unborn Heirs-Repudiation of Worthier Title Doctrine,* 66 Columbia L.Rev. 1552, 1557 (1966).

Such a guardian, as an officer of the court, would act in a fiduciary capacity subject to the supervision of the court in safeguarding the interests of future claimants. *See* Note, *Guardians Ad Litem,* 45 Iowa L.Rev. 376, 387 (1960). The guardian would also be liable for any negligent representation made. *See Trusts, supra* at 1557. It is not beyond peradventure that such guardian could be surety-bonded.

Courts have likewise invoked their equitable power to appoint legal representatives for personal injury plaintiffs in receivership cases. *Pennsylvania Steel Co. v. N.Y.C. Ry. Co.,* 165 F. 457 (S.D.N.Y.1908) (intervention of tort creditors committee as party defendant on behalf of themselves and all others similarly situated allowed); *see also Pennsylvania Steel Co. v. N.Y.C. Ry. Co.,* 221 F. 440 (S.D.N.Y.1915). In the latter case, the court explained that while all creditors have an interest in preserving and increasing the estate, the interests of various creditors were often adverse to each other. The court stated:

> Where a complicated controversy involving many different interests in a fund is before the court, and some particular interest is not so represented that the facts supporting its claim are likely to be fully brought out and

precatory and are not preclusive of other considerations. Accordingly, a hearing will be scheduled at which time consideration will be given to the precise form and function of the legal representative to be appointed. The parties in interest may make and serve submissions in this regard 14 days prior to the scheduled hearing date.

> properly presented, we know no reason why the court may not assign some competent person to do such work, and compensate him as receivers' counsel are compensated, *viz.,* out of the funds in the hands of receivers. We think it would be unfortunate if the courts did not possess such power, because the receivers necessarily represent so many different interests that they must generally stand neutral, and there will be many occasions where correct conclusions can be reached only after all sides of the controversy have been vigorously presented.

221 F. at 446 (quoting *Robinson v. Mutual Reserve Life Insurance Co.,* 189 F. 347 (2d Cir.1911)).

*Amicus Curiae*

By the appointment of an *amicus curiae,* which literally means friend of the court, this Court can achieve an advisory kind of representation of future claimants without the effect of binding such claimants to determinations made herein. As one court has stated: "An amicus is not a party to the litigation, and therefore does not necessarily represent the views or interests of either party. Since an *amicus* does not represent the parties, but participates only for the benefit of the Court, it is solely within the discretion of the Court to determine the fact, extent, and manner of participation by the *amicus.*" *See Alexander v. Hall,* 64 F.R.D. 152, 155 (1974). However, the disadvantage of this approach is that the amicus does not possess the singular purpose of advocating the interests of future claimants, but is rather an advocate only of the interests of the court, in, *inter alia,* uncovering facts. Perhaps more importantly, an *amicus* may aid the Court in its crucial consideration of plan confirmability under 11 U.S.C. Section 1129.

Because a Court is entitled to ardent advocacy of each litigant's most advantageous position, the Court in *Laker Airways, Ltd. v. Pan American World Airways,* 577 F.2d 348 (D.D.C.1983), appointed an *amicus curiae* to allow the continuation of the suit with the most effective representation of plaintiff's interests therein. The court declared:

> As for the Court itself, it cannot act on its own, not only because it lacks the necessary facilities ... but also, and more importantly, because, consistently with our system, the issues should be explored and briefed independently, and those briefs should then be

### III. *Conclusion*

For the reasons set forth at length herein and in Decision No. 1 on correlated Manville matters, Keene's motion for the appointment of a legal representative is granted.[8]

It is SO ORDERED.

responded to by the parties before the Court renders a final decision.
At 355.

*Examiner*

Another concept for consideration to assure the adequate representation and protection of these putative future claimants is found in Code Section 1104(b), namely, the appointment of an examiner. Under this section:

> [A]n examiner may be appointed in any type of reorganization case, large or small, where the debtor is permitted to remain in possession.... [A]ppointment must be requested by a party in interest, there must be a hearing on notice, and it must appear that ... the appointment is in the best interest of creditors, and equity security holders, and other interests of the estate....

11 U.S.C. § 1104, Official Comment (1983). The examiner, like the trustee, has a fiduciary obligation to manage the reorganization for the protection of all parties who will be affected by the reorganization. *See Matter of Boston & Providence R. Corp.,* 673 F.2d 11 (1st Cir.1982). While the examiner, like the *amicus,* is not bound to represent any particular party in the reorganization, his duties are not limited to conducting an investigation. In fact, it is conceivable that for sufficient cause shown, he may file a plan of reorganization, either independently or in cooperation with any and all of the interested parties. *See In re Wilton Realty,* 30 F.Supp. 486 (E.D.Mich.1938), *aff'd,* 106 F.2d 1022 (6th Cir.1939), cert. denied, 308 U.S. 626, 60 S.Ct. 386, 84 L.Ed. 523 (1940). *See also* Code Section 1106(b) (examiner may perform any other duties of the trustee that the court orders the debtor in possession not to perform). The examiner concept is attractive in that there is clear statutory authority for it under the Code, as opposed to the essentially equitable considerations justifying the appointment of an amicus or guardian. On the other hand, the examiner's role, although elastic, is nevertheless limited by the scope of Sections 1104 and 1106 of the Code.

8. The Court may appoint such representative despite any perceived jurisdictional problem pursuant to the Emergency Rule. The Emergency Rule was proposed by the Judicial Conference of the United States in order to allow for the continuation of an orderly bankruptcy system in light of the United States Supreme Court's invalidation on June 28, 1982 of part of

the current bankruptcy law in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Each district has adopted in large measure this proposed rule pursuant to which bankruptcy courts may still decide those bankruptcy matters "arising under" the Code, but may only adopt proposed findings of fact and conclusions of law on matters "related to" the Code. The District Court for the Southern District of New York adopted the Emergency Rule on December 21, 1982 in anticipation of the Congress' inability to obtain a third stay of the effect of the *Marathon* decision. Under the Emergency Rule, the appointment of a legal representative for claimants is clearly a core matter arising under the Code. Paragraph (d) of the Rule details those matters which are not "related matters" and includes those, as the instant one, related to the administration of a bankruptcy case. *See* Code Section 1471. (Colliers Pamphlet Edition [including the Emergency Rule] 1983). Furthermore, even if the appointment were to be considered a "related to" matter, the possible jurisdictional imprimatur of certification by the District Court exists.