In re John TORREZ, Jr., and
Jessie Torrez, Debtors.

Bankruptcy No. 189–02478–A–7F.

United States Bankruptcy Court,
E.D. California.

June 12, 1991.

Stephen J. Tully, Garrett & Tully, Pasadena, Cal., for Northwestern Mutual Life Ins.

Michael Terry Hertz, Lang, Richert & Patch, Fresno, Cal., for Tractor.

Hilton A. Ryder, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, Cal., for debtors.

Gary Dyer, Office of the U.S. Trustee, Fresno, Cal.

Michael W. Stelzer, Fresno, Cal., for Rachael Torrez Tristao.

## OPINION

RICHARD T. FORD, Bankruptcy Judge.

### I.

### INTRODUCTION

This opinion determines several matters. First, does this Court have jurisdiction to decide this controversy as a contested matter or should it have been brought by way of adversary proceeding? Secondly, if properly before the Court as a contested matter, does the moving party have standing under 11 U.S.C. § 1109(b) to appear and be heard and is permissive intervention under Bankruptcy Rule 2018(a) appropriate? Lastly, if determined to be a contested matter and if the moving party has standing and is permitted to intervene, was the automatic stay under 11 U.S.C. § 362(a) violated by Northwestern Mutual Life Insurance Company's, the moving party herein, foreclosure on real property in which the Debtors claim an interest as property of the estate?

### A. FORECLOSURE OF THE REAL PROPERTY

On October 21, 1975, Northwestern Mutual Life Insurance Company ("Northwestern") loaned John Torrez, Jr. and Jessie Torrez ("Debtors") $420,000.00. Debtors executed a promissory note on the same date calling for bi-annual payments in the amount of $21,000.00.[1] The loan was secured by a deed of trust recorded October 31, 1975, encompassing eight parcels of real property legally described in Exhibit "A" attached hereto and incorporated herein by reference.

Between October 31, 1975 and 1978 (the exact date can not be found in the record),

Debtors conveyed five of the eight parcels (Parcels 1, 2, 3, 5, and 8, as described in Exhibit "A" hereto) to their children, Rachel Torrez Tristao, Pete Torrez, and Joseph Torrez. These parcels are the subject of this motion.

In 1978, and after Debtors' conveyance of the five parcels, Debtors borrowed an additional $250,000.00 from Northwestern.[2] An amendment to the deed of trust was concurrently executed by Debtors and their children on April 20, 1978, reflecting the new loan balance. The Amendment of Deed of Trust[3] was recorded May 4, 1978.

Debtors and their children defaulted on the property tax payments beginning in 1980. Northwestern paid all taxes due between 1980 and 1989 to protect its security. Beginning in 1983, Debtors and their children also defaulted on their irrigation assessments. Between 1983 and 1989, Northwestern paid all irrigation assessments to protect their security.

The unrefuted evidence is that the debtors ceased making payments on the amended note on March 1, 1985. (see Arneson and Keyes declarations attached to Exhibit 9 of Northwestern's motion) Northwestern deferred foreclosure proceedings for three years and three months. On June 7, 1988, Northwestern served and recorded a Notice of Default. The foreclosure sale reference all eight parcels as described in Exhibit "A" hereto was originally set for October 1988; however, at the request of the debtors and their children, it was postponed twice, finally being set for June 1, 1989. On October 18, 1988, Fullerton, Lang, Richert and Patch moved this Court for an order authorizing their withdrawal as counsel for the creditors' committee in the Joseph and Mary Torrez bankruptcy, case # 183–00171A–11F, so they could represent and bid for Lawrence Tractor, Inc.

---

**1.** Exhibit "1" to Northwestern's motion.

**2.** The original promissory note reference the October 1975 loan with Northwestern was amended April 20, 1978. This "Amendment Of Promissory Note", attached as Exhibit "3" to Northwestern's motion, reflected that the original promissory note, Exhibit "1" to Northwestern's motion, was amended to include the addi-

tional principal amount of $250,000.00 to be combined with the original indebtedness for a consolidated principal sum of $649,000.00. Debtors' children *were not* signatories to the "Amendment of Promissory Note."

**3.** Exhibit "4" to Northwestern's motion.

("Lawrence") at the foreclosure sale. This request was granted October 24, 1988. Northwestern asserts that both the Debtors and Lawrence were well aware of the foreclosure proceedings.

On June 1, 1989, and immediately prior to the foreclosure sale, Debtors and their children filed individual bankruptcies thereby stopping the foreclosures. Debtors are farmers and sought relief under Chapter 11 of the Code [4]. Their children sought protection under Chapter 12 of the Code. Within two weeks after the filing of the petitions, Rachel Torrez Tristao and Pete Torrez voluntarily dismissed their bankruptcies.

Debtors filed their statement of executory contracts and unexpired leases on June 30, 1989, listing a sole leasehold of 120 acres of open ground from Mercedes Velasco for the annual payment of $20,000.00.

Northwestern moved for relief from the automatic stay (MC# JDC–1) on July 24, 1989, seeking authority to foreclose upon Debtors' three parcels (parcels 4, 6, & 7 in Exhibit "A" hereto) of real property. Alternatively, Northwestern sought dismissal of the Debtors' case on the grounds that it was filed in bad faith. Debtors filed their response and declaration of John Torrez, Jr., opposing Northwestern's motion for relief on August 8, 1989. This matter was heard on August 21, 1989, at which time Northwestern's motion was denied without prejudice.

Debtors moved to dismiss their case on July 25, 1989, asserting they no longer needed bankruptcy protection to prevent the foreclosure on the real property by Northwestern and FmHA. FmHA has a scheduled indebtedness of $1.8 million and held a second deed of trust on 250 acres of Debtors' real property. As additional security for the $1.8 million indebtedness, Debtors assigned four promissory notes

each in the amount of $65,000.00 owed by their children to FmHA.[5] They asserted their confidence that negotiations with these two creditors could be successful without Chapter 11 protection.

The U.S. Trustee objected to Debtors' motion to dismiss on July 31, 1989, contending it was not in the best interests of all creditors to dismiss because of the myriad of problems and debt confronting the estate. On the same date, Lawrence, Debtors' largest trade creditor, filed its opposition claiming that Debtors' motion to dismiss was procedurally defective. Creditor, J.D. Heiskell Co., filed its motion supporting Lawrence's opposition on August 4, 1989. Debtors withdrew their motion to dismiss at the hearing on August 15, 1989.

Respecting the children's property, Northwestern deferred foreclosure efforts until four months after Debtors' petition was filed. Thereafter, on October 10, 1989, a trustee's sale of the children's property (parcels 1, 2, 3, 5, & 8 of Exhibit "A" hereto) was held. Debtors' three parcels securing Northwestern's position were not sold at the trustee sale. Northwestern obtained title to the children's real property at the foreclosure sale by credit bidding the sum of $760,709.90 for the five parcels.

Thereafter, Rachel Torrez Tristao and Pete Torrez filed an action in the Tulare County Superior Court for the State of California to set aside the foreclosure sale, for quiet title and an accounting. That matter was removed to the Federal District Court for the Eastern District of California, case number CV–F–89–772 REC. On May 21, 1990, Northwestern filed its Motion for Summary Judgment in the District Court case. On July 17, 1990, the District Court entered judgment granting Northwestern's motion, holding that the foreclosure sale was proper under state law

---

**4.** All references to the "Code" herein refer to the *Bankruptcy Code as amended in 1984 unless otherwise stated.*

**5.** Although John Torrez, Jr. states in his declaration that these notes each were in the original principal amount of $75,000.00, Debtors' original and amended A–2 schedule have the notes *scheduled at $65,000.00. Neither the originals* nor copies of these promissory notes have been offered into evidence. The record also fails to indicate when these notes were assigned to FmHA.

and that Northwestern was the legal owner of the property.[6]

Debtors filed their first Disclosure Statement and Plan in this case on September 11, 1989. In light of the objections raised by the United States Trustee's office, Lawrence, and Northwestern, Debtors filed an Amended Disclosure Statement and Plan on November 3, 1989. Further objections were lodged causing Debtors to file a Second Amended Disclosure Statement and Plan on December 1, 1989. Debtors' Second Amended Disclosure Statement was approved on December 1, 1989. Lawrence filed a Creditor's Disclosure Statement and Plan on November 8, 1989. The Disclosure Statement was approved as amended on December 8, 1989. Confirmation reference both proposed Plans of Reorganization was heard on January 3, 1990. Neither Debtors' nor Lawrence's plans were confirmed. Pursuant to Debtors' motion, the case was converted to Chapter 7 on March 13, 1990. Paul Guymon was appointed as trustee on March 20, 1990.

Debtors amended their schedules April 19, 1990. Respecting business leases as set out in ¶ 17 of Debtors' Statement of Affairs, Debtors deleted the lease of 120 acres of open ground from Mercedes Velasco as a business lease and did not include it anywhere else in the schedules as amended. There is no reference to, or addition of, any other leaseholds in this amendment nor in Debtors' original Statement of Affairs.

Debtors' original and amended A-2 schedule shows Northwestern's claim in the amount of $700,000.00.[7] Both the original and amended A-2 schedule reflect that Northwestern's claim was secured by a first deed of trust on a 250 acre ranch. The 250 acre ranch is scheduled as having a market value of $425,000.00 in both the original and amended A-2 schedules. While the original A-2 schedule also indicates that Northwestern's claim was additionally secured by a first deed of trust on Debtors' residence and 388 acres having a market value of $833,000.00, the amended A-2 schedule deletes reference to this as security.[8] The amended A-2 schedule also shows that FmHA holds a second deed of trust against the same 250 acres and other assets pledged as security, including four promissory notes from the children payable to the Debtors assigned to FmHA, equipment, a lien on 1989 crop proceeds, and first deeds of trust on two parcels of property unrelated to the instant proceedings. The amount of FmHA's claim without deduction of the value the security is $1.8 million.

Debtors moved to reconvert their case to Chapter 11 on January 8, 1991. In Debtors' motion to convert, they asserted that Northwestern violated the automatic stay by foreclosing on 520 acres of property owned by their children in which they claimed an interest. They further advanced that a settlement had been reached between the trustee, Lawrence, themselves and other family members respecting adversary proceeding # 190-0003 herein, involving the recovery of 120 acres of land from their daughter, Rachel Torrez Tristao.[9] Additionally, they asserted resolution

---

**6.** Exhibits "9" and "10" to Northwestern's motion.

**7.** The original and amended A-2 schedules are attached hereto as Exhibits "B" and "C" respectively.

**8.** Regarding the security for Northwestern's claim, Debtors' amended A-2 schedule is ambiguous. What is apparent is that the only security given by Debtors is the 250 acre ranch as there would be no other reason to amend this portion of the A-2 schedule relating to Northwestern's claim. It is clear that the residence and 388 acres were deleted as security as they were listed in the original A-2 schedule as security for both Northwestern's and FmHA's claims, but were deleted as security for these claims in the amended A-2 schedule. Moreover, Debtors' amended B-1 schedule (Exhibit "E" hereto) specifically deletes the residence and 388 acres as real property assets. However, the amended A-2 schedule reflects two market values for the 250 acres, those being $833,000.00 and $425,000.00. It appears that the $425,000.00 is correct and upon amending this portion of the A-2 schedule, Debtors' counsel apparently neglected to delete the $833,000.00 figure that was scheduled as the market value of the residence and 388 acres in the original A-2 schedule.

**9.** The 120 acres subject of the adversary proceeding was not foreclosed on by Northwestern and in no way is involved in this matter. It is legally described as follows: "The North half of

respecting the unsecured claims in the estate had been achieved.

Debtors advanced that they would support a consensual plan submitted by Lawrence creating a new corporation, TORREZ FARMS, INC. Although Hertz, attorney for Lawrence, attests in his declaration that the consensual Plan and Disclosure Statement would be on file prior to April 2, 1991, to date they have not been filed. Hertz further attests that he has advised Northwestern's counsel that the proposed consensual Plan will not impair Northwestern, thereby precluding Northwestern's ability to participate in the confirmation process. After creating the new corporation, Debtors, through the corporation, would attempt to recover the children's property foreclosed upon by Northwestern for the benefit of the unsecured creditors. The proposed consensual Plan, as set forth in Debtors' motion to convert, contemplates the unsecureds being able to purchase stock thereby providing the required influx of capital to cure the default should the attempt to set the foreclosure aside be successful. Debtors asserted that the Chapter 7 trustee lacked the requisite funds to set aside the foreclosure, as curing the default would require several hundred thousand dollars which the estate did not have. Without the benefit of setting aside the foreclosure, the estate would be limited to funds sufficient only to pay the costs of administration and priority taxes. Based upon the above factors, Debtors advanced that a recovery was possible for the estate and in the creditors' best interests. Over Northwestern's objection, the Court ordered the case converted to Chapter 11 on January 16, 1991.

## B. THE INSTANT PROCEEDINGS

On March 4, 1991, Northwestern filed its motion, the subject of this opinion, with accompanying points and authorities seeking a determination that the automatic stay was inapplicable to their foreclosure of the children's real property and that the same was not property of the estate. North-

western requests that the Court take judicial notice of several documents as set out in their Request for Judicial Notice filed the same date. The Request for Judicial Notice is addressed in a separate order issued concurrently herewith.

Northwestern contends that by virtue of 11 U.S.C. 1109(b) and Bankruptcy Rule 2018(a), this Court is vested with limited jurisdiction to determine whether the automatic stay was applicable to the property foreclosed upon.

Lawrence moved to intervene on March 26, 1991, and opposed Northwestern's motion. At the hearing on this matter, the Court granted Lawrence's request to intervene. Lawrence contends through the Hertz declaration and points and authorities, that Northwestern's motion is jurisdictionally deficient and that Rule 9011 sanctions are appropriate for their bringing of a frivolous motion. Lawrence argues that Northwestern is seeking declaratory relief and that the matter can only be heard as an adversary proceeding and not as a contested matter (motion). Alternatively, if the Court is inclined to decide this matter by way of motion, Lawrence requests withholding of judgment until confirmation.

On March 28, 1991, Debtors filed their opposition to Northwestern's motion seeking an order denying the motion or dropping it from calendar. Debtors assert that the matter is a request for declaratory relief falling within the ambit of Rule 7001, et seq. Debtors contend that there is nothing pending before the Court upon which jurisdiction can be based. They reason this matter is inappropriate for determination as the Court lacks the requisite jurisdiction. They also assert that Northwestern lacks standing to bring the motion and that the notes assigned to FmHA allegedly securing certain obligations on the property were property of the estate.

Northwestern responded separately to both Lawrence's and the Debtors' oppositions. Northwestern advances that Lawrence's position is without support in the Ninth Circuit. Northwestern contends that

the Northeast quarter; and the Southwest quarter of the Northeast quarter of Section 8, Town-

ship 22 South, Range 24 East, Mount Diablo Base and Meridian."

the Ninth Circuit recently rejected the argument that an application for determination for nonapplicability of the automatic stay should be brought by way of adversary. They assert that the Ninth Circuit explicitly held such applications to be contested matters properly brought by way of motion.

They further argue that jurisdiction exists under 28 U.S.C. § 1334 and that, as Debtors moved to reconvert to Chapter 11 for the purpose of taking action to set aside the foreclosure, the Debtors have placed the question of applicability of the stay before the Court. Moreover, they contend that, should the Court grant Lawrence's request to delay ruling on the applicability of the automatic stay until after confirmation, confirmation will be impossible as there will be no way to determine plan feasibility as required by 11 U.S.C. § 1129(a)(11).

Northwestern responds to Debtors' opposition incorporating all their responses to Lawrence's opposition. Debtors' opposition raises two additional issues not raised by Lawrence. Northwestern counters Debtors' assertion that Northwestern lacks standing to bring their motion by advancing that they are an interested party with standing clearly within the meaning of 11 U.S.C. § 1109. They also assert that as an interested party, they should be afforded the opportunity to intervene to effectively appear and be heard to protect their interests. Lastly, Northwestern asserts that the law of the Ninth Circuit is such that foreclosure of non-estate property securing a debtor's debts is not violative of the automatic stay, even where the debt remains after the foreclosure.

## C. THE APPEARANCES

This matter came on for hearing April 2, 1991. Stephen J. Tully of Garrett & Tully appeared for creditor and moving party, Northwestern. Hilton Ryder, of McCormick, Barstow, Sheppard, Wayte & Carruth, appeared for Debtors. Michael T. Hertz of Lang, Richert & Patch appeared on behalf of Lawrence, and Gary Dyer appeared for the United States Trustee's office. Debtors', Northwestern's and Lawrence's positions were argued by counsel substantially as set forth in their pleadings. The U.S. Trustee's position was that the Court could properly consider Northwestern's motion as a contested matter under the reasoning set out in *In Re Wade*, 115 B.R. 222 (9th Cir. BAP 1990). Briefly, the *Wade* court held that requests to determine the applicability of the automatic stay may properly be commenced by motion. Mr. Dyer expressed no opinion as to whether the automatic stay was violated by Northwestern's foreclosure of the children's real property. At the close of the hearing, the Court set a supplemental briefing schedule. Lawrence filed its Supplemental Memorandum in opposition to Northwestern's motion on April 10, 1991. Lawrence asserts that Northwestern's motion is procedurally deficient in that it falls within the realm of Bankruptcy Rule 7001 as it seeks a determination as to the applicability of the automatic stay reference the real property foreclosed upon and it is therefore inappropriately brought as a motion. Lawrence also asserts that 11 U.S.C. 1109(b) and Rule 2018(a) are not jurisdictional provisions and that Northwestern cannot refuse to accede to the Court's general jurisdiction to have this matter heard.

Additionally, Lawrence submits that the cases cited by Northwestern do not support their contention that the matter is properly brought by way of motion. Lawrence painstakingly distinguishes the cases cited by Northwestern and asserts that in each case a motion for relief was filed and alternatively sought a finding that the stay was inapplicable to the property subject of the motion. Therefore, Lawrence suggests that a request to find the stay inapplicable may only attach to a request for relief from the stay and not be brought independently. Lawrence reasons that, as a motion for relief at this juncture would be an act in futility since the foreclosure has already occurred, Northwestern is compelled to proceed by way of adversary proceeding as they seek a determination of the nature, extent and validity of Northwestern's interest in the property.

Lawrence also suggests that as the Debtors and major unsecured creditors have now combined forces to (1) reconvert this case back to Chapter 11, (2) propose a consensual Plan of Reorganization creating a new corporate entity whose primary purpose is to bring an action to set aside the foreclosure by Northwestern, and (3) which Plan also provides that Northwestern is unimpaired so they cannot participate in the voting and cram-down procedure in the confirmation process, a determination of the applicability of the automatic stay must be by way of adversary proceeding and this is the *only* correct procedure. Lawrence alludes to Northwestern's motion as being a tactical maneuver to circumvent and end-run the confirmation process. Northwestern, on the other hand, believes there is a more direct approach to the matter in dispute. They vigorously advance that this matter may appropriately be determined by way of motion.

Lawrence also contends that the motion fails on its merits as Northwestern's conduct in foreclosing on the children's property was violative of 11 U.S.C. § 362(a)(6). Lawrence argues that Northwestern's actions were violative of the stay whether or not the Debtors had any interest in the property as § 362 is to be interpreted broadly and at the very least, Debtors had a possessory interest in the property protected by the stay.

Northwestern responded to Lawrence's supplemental points and authorities on April 17, 1991. They contend that 11 U.S.C. § 362(a)(6) is inapplicable in this instance as it applies only in consumer cases. Northwestern also advances that Debtors held no interest in the children's property. Further, they assert that the Debtors' failure to schedule the purported interests in the property foreclosed upon estops them from now asserting any interest therein. Northwestern also argues that Debtors held no possessory or leasehold interest in the subject real property that is includable as property of the estate. Lastly, Northwestern advances that Debtors held no in-

terest in the alleged junior deeds of trust that would be includable as estate property. The Court notes that Debtors did not schedule the junior deeds of trust allegedly assigned to FmHA. Rather, the schedules only reflect that Debtors assigned four promissory notes due from their children to FmHA as additional security respecting FmHA's $1.8 million claim. Northwestern filed objections to John Torrez, Jr.'s declaration on April 17, 1991. A Supplemental Request for Judicial Notice of the documents attached as Exhibits 17–20 to their supplemental reply filed April 17, 1991, was also filed. Rulings on the objections and Supplemental Requests for Judicial Notice are set forth in separate orders issued concurrently herewith.

## II.

## ANALYSIS

### A. JURISDICTION

Northwestern asserts in its motion that jurisdiction is invoked under 11 U.S.C. § 1109(b) and Bankruptcy Rule 2018(a). By virtue of these two provisions, Northwestern seeks to invoke limited jurisdiction of the Court to determine whether the automatic stay was in full force and effect as to the children's real property foreclosed upon. Northwestern does not consent to this Court's jurisdiction for any other reason other than to obtain a determination as to whether the automatic stay applied to the property foreclosed upon.[10]

Debtors assert that neither 11 U.S.C. § 1109(b) nor Bankruptcy Rule 2018(a) provide jurisdiction to hear Northwestern's motion. They advance that both provisions condition jurisdiction on the pendency of a matter before the Court upon which the moving party can be heard or intervene. Debtors argue that Northwestern is seeking declaratory relief which may only be brought by an adversary proceeding as set out in Bankruptcy Rules 7001, et seq. They further contend that, as this matter

10. Northwestern's response to Lawrence's opposition acknowledges that jurisdiction over the case exists under 28 U.S.C. § 1334. However, the thrust of their argument is that they only consent to limited jurisdiction under 11 U.S.C. 1109(b) and Bankruptcy Rule 2018.

should have been brought as an adversary proceeding, the Court lacks jurisdiction to hear this matter. Lastly, as there is no adversary proceeding before the Court, Debtors argue that there is no action in which Northwestern can either intervene or be heard.

■ Lawrence argues that 28 U.S.C. § 1334 is the jurisdictional provision applicable to this proceeding. It asserts that Northwestern cannot come into this Court requesting the relief it desires without acceding to the Court's jurisdiction.

This Court agrees with Lawrence. Jurisdiction, if it exists at all, will be by virtue of 28 U.S.C. § 1334(b). Moreover, should jurisdiction exist to hear this matter, and if determined to be core in nature, then this Court is empowered to hear and decide this controversy by the authority vested in it pursuant to 28 U.S.C. § 157.

The test employed in the Ninth Circuit for a determination of whether a court has subject matter jurisdiction to hear a controversy is set out in *In re Fietz*, 852 F.2d 455, 457 (9th Cir.1988). Under *Fietz*, a determination is made as to whether the subject action is "related" to the bankruptcy, and if so, subject matter jurisdiction exists. Whether a matter is related is determined by whether "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy (emphasis added)." *Fietz, supra* approvingly citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir.1984). The *Fietz* court expressly rejected any limitation on this definition as set out in *Pacor, supra*. *Fietz, supra* at p. 457. This test provides a broad base upon which subject matter jurisdiction can be determined.

■ The facts in this case amply indicate that the outcome of this proceeding could effect the administration of the estate. If the automatic stay was violated, this would effect the administration of the estate. If this matter should have been brought by way of adversary, this would effect the administration of the estate. If the Court delays in ruling on this matter until after confirmation, this would effect the administration of the estate.

■ Accordingly, this Court finds and holds that subject matter jurisdiction exists for this dispute to be decided within the meaning and intent of 28 U.S.C. § 1334. Additionally, this is a core proceeding within the meaning of 28 U.S.C. 157(b)(2)(A)(O). As advanced by Lawrence, Northwestern cannot seek a determination of this matter without submitting to the Court's general jurisdiction. Northwestern's objection to this Court's general jurisdiction is therefore overruled.

## B. STANDING

Northwestern asserts a right to be heard under 11 U.S.C. 1109(b). That Code section provides:

(b) A party in interest, including the debtor, the trustee, a creditors committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and be heard on any issue in a case under this chapter.

The crucial determination is whether Northwestern is "a party in interest" within the contemplation of the Code section. If Northwestern is a party in interest, then they may appear and be heard.

■ Case law expansively interprets "party in interest" under 11 U.S.C. § 1109(b). *In re Hathaway Ranch Partnership*, 116 B.R. 208, 213 (Bkrtcy.C.D.Cal. 1990); *In re Public Service Co. Of New Hampshire*, 88 B.R. 546, 551 (Bkrtcy. D.N.H.1988); *In re Johns–Mansville Corp.*, 36 B.R. 743, 747 (Bkrtcy. S.D.N.Y.1984) referring to "party in interest" as an "Elastic Concept." Moreover, as there is no specific definition under the Code and the term appears some 46 times within, such a determination must be made on a case by case basis. *In re Public Service Co. Of New Hampshire, supra* at p. 551; *In re Johns–Mansville Corp., supra* at p. 747 citing *In re Penn Dixie Industries, Inc.*, 9 B.R. 941, 943 n. 7 (Bkrtcy.S.D.N.Y.1981); *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3rd Cir.1985).

The elastic and flexible applicability of the "party in interest" concept arose to insure that all interests that may be significantly impacted by a Chapter 11 case have an adequate opportunity for fair representation. The entities listed in 11 U.S.C. § 1109(b) are not the only parties in interest that may appear under the section. *In re Hathaway Ranch Partnership, supra* at p. 213; *In re Amatex Corp., supra* at p. 1042; see also 5 *Collier on Bankruptcy* ¶ 1109.2, at 1109–22 (King 15th Ed.1984). Rather, 1109(b) does not limit who can be a "party in interest." 5 *Collier on Bankruptcy, supra* at p. 1109–24.

The test to determine whether an entity is a party in interest is "whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation." *In re Public Service Co. Of New Hampshire, supra* 88 B.R. at p. 551 citing *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3rd Cir.1985).

Debtors reconverted their case to Chapter 11 to try and confirm a plan contemplating the reorganization of the Debtors through the creation of a new corporation. This new corporation, TORREZ FARMS, INC., will have as one of its purposes the function of trying to set aside the foreclosure sale reference the children's five parcels of real property and recover the same for the benefit of the estate's unsecured creditors. Debtors set out in their motion to reconvert filed January 8, 1991 (MC # HAR-1) that the Chapter 7 trustee was not in a position to bring an action to set aside the foreclosure as the estate lacked the requisite funds to do so. Debtors advanced that conversion to Chapter 11 and creation of the new corporation with the new stock offering to the unsecureds would provide the needed influx of capital to cure the defaults (several hundred thousand dollars) relative to the foreclosed properties should the attempt to set aside the foreclosures be successful. Moreover, as set forth in the Hertz declaration, Lawrence has advised Northwestern that it will be unable to participate in the voting and cram-down procedure in the confirmation process as Northwestern is unimpaired under the plan.

Considering these factors, the Court concludes that Northwestern is a party in interest within the meaning of 11 U.S.C. § 1109(b). Northwestern certainly has a stake in the outcome of the case, and if the proposed plan were confirmed, Northwestern would be bound to defend any action to set aside the foreclosure. Moreover, should Northwestern prevail at this juncture in proving that the automatic stay was inapplicable to the property foreclosed upon, the unsecured creditors and creditor body in general will be better informed as to the feasibility of the plan as suggested by Northwestern in its reply to Lawrence's opposition filed March 29, 1991.

## C. INTERVENTION

Intervention arises in the bankruptcy context in two manners. First, there is intervention under Bankruptcy Rule 2018(a). This rule is applicable to the bankruptcy case, which encompasses all controversies determinable by the court and all matters of administration arising during the pendency of the case. 5 *Collier on Bankruptcy, supra*, ¶ 1109.02 at p. 1109–31. Colliers terms it as the "whole ball of wax."

Then there is intervention as set out under Bankruptcy Rule 7024. The Advisory Committee Note to Bankruptcy Rule 7024 states:

A person may seek to intervene in the case under the Code or in an adversary proceeding relating to the case under the Code. Intervention in a case under the Code is governed by Rule 2018 and intervention in an adversary proceeding is governed by this rule. Intervention in a case and intervention in an adversary proceeding must be sought separately.

Northwestern has only sought intervention under Bankruptcy Rule 2018(a). However, prior to any determination as to whether intervention should be granted to Northwestern under Rule 2018 as they suggest, it must be determined whether Northwestern's motion is properly before the Court as a contested matter or whether it

should have been brought by way of adversary proceeding.

## D. ADVERSARY PROCEEDING V. CONTESTED MATTER

■ Northwestern's motion seeks a determination that the automatic stay was inapplicable to the property foreclosed upon and also that the same was not property of the estate. Debtors and Lawrence counter Northwestern's motion advancing that Northwestern is seeking a determination as to the validity, priority, or extent of a lien or other interests in property and as such, is essentially an adversary proceeding governed by Bankruptcy Rule 7001 et seq. Debtors and Lawrence suggest that as Northwestern is seeking declaratory relief, their motion is jurisdictionally deficient.

Northwestern advances that this matter is a contested matter governed by Rules 4001(a) and 9014. In support of their contention, Northwestern argues that the Ninth Circuit Court of Appeals has recently ruled that a claim by a party that the automatic stay is not applicable does not transform the claim into an adversary proceeding under Rule 7001. While this was the holding of the court, it was the Bankruptcy Appellate Panel in *In re Wade*, 115 B.R. 222 (9th Cir. BAP 1990) that rendered the decision and not the Ninth Circuit Court of Appeals. Northwestern also cites *Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d 1421, 1425 (9th Cir.1985) and *In re Shipley*, 35 B.R. 251, 253, (Bkrtcy.D.Haw. 1983) as supporting their contention that this is a contested matter.

The *Wade* decision involved a motion by the Arizona State Bar to find the automatic stay inapplicable under § 362(b)(4) and alternatively, if the stay was applicable, that relief should be granted for cause under § 362(d)(1). *Id.* at p. 224. The Court notes that the motion in *In re Shipley, supra* also sought in the first instance a determination that the automatic stay was inapplicable and alternatively requested relief from the stay. In affirming that the automatic stay was inapplicable to the state Bar proceedings in *Wade*, the BAP stated:

"The Bar's request for relief from the stay was a contested matter that was properly commenced by a motion. Bankruptcy Rules 4001(a) and 9014. The fact that the Bar alternatively contended that the stay did not apply, did not change this into an adversary proceeding. Bankruptcy courts regularly hear motions for relief from the stay where a party contends in the alternative that the stay does not apply, but that if it does it should be lifted. The policies favoring expedited relief apply equally to such alternative motions as to motions which request only that the stay be lifted. Framing the request for relief in such a manner, therefore, should not convert the dispute into one which should be determined in an adversary proceeding. Given that the Bar's request for relief was properly brought as a motion, the debtor's counterclaim was procedurally inappropriate ..."

*Id.* at 230.

Lawrence argues that *Wade* states a request in the alternative to find the stay inapplicable may properly be appended to a motion for relief from the automatic stay. They contend that, as there is no request for relief as the act in violation of the automatic stay (the foreclosure) has already occurred, there is no motion to which Northwestern's request can attach. Therefore, Lawrence argues the matter is inappropriately before the Court and should have been brought by way of adversary proceeding.

Section 362(d) provides that the Court shall grant relief under § 362(a) "such as by terminating, annulling, modifying, or conditioning such stay ..." Annul has many definitions, some of which are:

1) to declare legally invalid; *Webster's Third New International Dictionary* (Merriam–Webster, 1986);

2) to declare *or* make legally invalid or void; *Webster's Ninth New Collegiate Dictionary* (Merriam–Webster, 1987);

3) to make void *or* of no effect; to deprive it of all force and operation; *Black's Law Dictionary* (West, 1979).

The language in *Wade* pertinent to the within controversy is that: "The policies favoring expedited relief apply equally to such alternative motions [requests to find the stay inapplicable] as to motions which request only that the stay be lifted. Framing the request for relief in such a manner, therefore, should not convert the dispute into one which should be determined in an adversary proceeding." This Court interprets "Framing the request for relief in such a manner ..." as meaning seeking a determination that the stay is inapplicable. Northwestern's motion is consistent with requesting relief by annulling the automatic stay under the above definitions of "annul." Such a motion seeks an order determining the stay legally invalid as to a creditor or property. Moreover, in all motions for relief from the automatic stay, the nature, extent, and validity of the creditor's interest are decided. It is not necessary to determine these matters by an adversary proceeding. Therefore, consistent with the swiftness that the legislature deemed necessary to advance the policies favoring expedited relief and this Court's authority to grant relief by annulling the automatic stay, the Court finds and holds that a request for such an order is a contested matter within the contemplation of Rule 9014 and that this matter is appropriately before the Court as a motion. No sound reason exists to require an adversary proceeding to determine that the automatic stay is of no legal effect.

Being appropriately before the Court as a contested matter, permissive intervention is governed by the provisions set out in Rule 2018(a). Rule 2018(a) provides:

(a) *Permissive Intervention.* In a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter.

Rule 2018(a) allows permissive intervention of an interested party upon a showing of cause either generally or with respect to any specified matter.

Cause may be shown by establishing some economic or other similar interest in the pending matter. *In re Public Service Co. of New Hampshire, supra,* 88 B.R. at p. 551; *In re Wilson,* 94 B.R. 886, 887 (Bkrtcy.E.D.Va.1989). Debtors reconverted their case to Chapter 11 expressly to place themselves in a position allowing them to make a concerted effort to set aside the foreclosure by Northwestern. Contrary to that advanced by the Debtors that there exists no matter pending before the Court into which Northwestern can intervene, the case itself is the matter pending into which Rule 2018(a) allows intervention. The proposed action reference setting aside the foreclosure may dramatically effect Northwestern's position. As no other entity exists to adequately protect Northwestern's position, this Court finds and holds that cause exists warranting permissive limited intervention under Rule 2018(a).

While cause exists under Rule 2018(a) warranting permissive intervention, courts must also consider whether intervention would result in undue delay or prejudice. *In re Public Service Co. of New Hampshire, supra,* 88 B.R. at p. 551 [citations omitted]. The court in *Public Service* at p. 551 fn. 2 noted that the same policy concerns arising under intervention as provided in Fed.R.Civ.P. 24(b) respecting prejudice and undue delay to the rights of other parties should be considered.

Debtors advance no argument that prejudice or delay will occur if Northwestern is allowed to intervene. Lawrence on the other hand advances that normally it would be in the best interest of all parties to make a determination as rapidly as possible. However, they assert, without support, that it would be contrary to the creditors' best interests in this instance. Northwestern persuasively reasons that the Court could not determine feasibility of the plan [11 U.S.C. § 1129(a)(11)] until and unless this matter is resolved. Based on this contention and the Debtors' and Lawrence's failure to persuasively show why determination should be held in abeyance, the Court finds and holds that neither undue delay nor prejudice will occur. Moreover, the Court is of the opinion that this matter is best laid to rest by speedy resolution.

As Northwestern is a party in interest, and as cause exists to intervene without prejudicing the rights of others or unduly delaying the proceedings, the Court holds that limited permissive intervention is appropriate in this instance to allow Northwestern to protect its interests.

## E. APPLICABILITY OF THE AUTOMATIC STAY

The real controversy in this matter is whether the automatic stay was violated by Northwestern's foreclosure of the children's real property. Northwestern contends that the automatic stay was inapplicable to the foreclosure sale. They initially argue that the real property was not property of the estate and that the automatic stay was without effect. Northwestern also asserts that Debtors are estopped from asserting any interest in the property as they failed to schedule any interest in the same. Moreover, Northwestern advances that under no circumstances can the foreclosure be held to be violative of the stay as it was not an act to collect on a debt of the Debtors.

 Debtors acknowledge in their opposition that Northwestern is entitled to the property and its possession. This is apparently so by virtue of the judgment entered by the District Court in the *Tristao* matter. The District Court held the foreclosure to be valid under California law and that Northwestern is the legal owner of the property by virtue of it successfully credit bidding at the foreclosure sale. This Court is bound by the District Court's findings of fact and conclusions of law reference the foreclosure sale.

Debtors however contend that FmHA held a junior trust deed on a portion of the property foreclosed upon. The Court notes that the schedules only reflect that FmHA held a second deed of trust on the 250 acre ranch. They further assert that upon the conveyance by Debtors of the properties to their children, they took back purchase money second deeds of trust that were listed in their schedules, each with a value of $65,000.00.[11] They allege that they subsequently "assigned" these deeds of trust to FmHA as additional collateral securing their debt. Respecting the children's properties, the schedules reflect that Debtors assigned four notes to FmHA each with a scheduled value of $65,000.00. Debtors argue that Northwestern's foreclosure acted to cut off the junior deeds of trust resulting in a substantially higher debt owed to FmHA than if the foreclosure had not occurred. They assert that the notes secured by the deeds of trust were property of the estate and that the foreclosure was violative of 11 U.S.C. §§ 362(a)(3) and (6).

Northwestern's response to Debtors' opposition is that nowhere in the schedules were the deeds of trusts identified as assets of the estate. This response is factually correct. Rather, they argue that the deeds of trust were scheduled as liabilities. As set out in footnote 11 herein, there are no deeds of trust scheduled. The schedules only mention four promissory notes assigned to FmHA. Northwestern contends that as they acted in reliance upon Debtors' schedules, as such, Debtors are estopped to contradict the position set forth therein. Moreover, Northwestern advances that upon the assignment to FmHA, all right, title, and interests in the deeds of trust passed to FmHA, and therefore the

11. Debtors' opposition at p. 4, lines 9–13, states, "When the parents conveyed the property to the children, they took back purchase money second deeds of trust that were listed in the schedules with a value of $65,000. These deeds of trust were assigned to Farmers Home Administration as additional collateral." John Torrez, Jr. attests "... the notes were fully secured and were valuable collateral for my FmHA debt. The effect of the foreclosure was to cut off these three junior deeds of trust rendering that collateral valueless to FmHA." The schedules do not list any of the junior deeds of trust held by Debtors respecting the children's properties. Moreover, Debtors have not offered into, nor is there, any competent evidence in the record of these junior deeds of trust. The Court does note that the Assignments of Deeds of Trust, Northwestern's Exhibits "17," "18," and "19," mention the existence of certain deeds of trust, each executed February 22, 1977. As stated before, the promissory notes are not in evidence. The schedules and evidence only reflect four promissory notes, each in the amount of $65,000.00, as having been assigned to FmHA as additional security on Debtors' $1.8 million indebtedness.

deeds of trust cannot be characterized as property of the estate. The record only reflects the assignment of four promissory notes to FmHA. Accordingly, the Court considers Northwestern's argument respecting assignment of the deeds of trust as representing their position on assignment of the promissory notes.

Lawrence, in its opposition, advances that Northwestern's foreclosure was violative of 11 U.S.C. § 362(a)(6) in that it constituted an act to collect or recover a claim against the Debtors. Lawrence asserts this is the case notwithstanding the fact that Debtors neither held title to, nor was the realty, property of the estate. Lawrence contends that as Debtors hold both a possessory and leasehold interest in the property, these interests are sufficient to invoke the provisions of 11 U.S.C. § 362(a)(6).

Lastly, there is a dispute between Northwestern and Lawrence as to the applicability of 11 U.S.C. § 362(a)(6) in this instance. Northwestern argues that 11 U.S.C. § 362(a)(6) is inapplicable in this instance as it applies only to consumer debts. Lawrence on the other hand asserts that such reasoning is misplaced and contends that Northwestern has miscited the legislative history underlying 11 U.S.C. § 362(a)(6).

### F. AVAILABILITY OF STAY PROTECTION UNDER 11 U.S.C. § 362(a)(6)

Preliminarily, the Court addresses the issue raised as to whether 11 U.S.C. § 362(a)(6) only applies to consumer debts. Northwestern asserts that as a matter of law 11 U.S.C. § 362(a)(6) has no application in this case as it applies solely to consumer debts. Lawrence argues that Northwestern has misinterpreted and miscited the case law and the legislative history.

Lawrence is correct that 11 U.S.C. § 362(a)(6) does not solely apply to consumer debts. 11 U.S.C. § 362(a)(6) precludes any attempt to collect, assess, or recover on prepetition claims. The language in the section does not limit the protection to prepetition "consumer" claims. To the contrary, the language is specifically broad to account for any attempt to collect on any

prepetition claim. While the legislative history references certain problems associated with consumer debts, nothing indicates that the legislature intended this section to operate to the exclusion of non-consumer debts. Consistent with the broad protection afforded under the automatic stay [*In re Bialac*, 712 F.2d 426, 431 (9th Cir. 1983)], the Court finds and holds that 11 U.S.C. § 362(a)(6) is available for application in this case.

### G. PROTECTION UNDER THE AUTOMATIC STAY

In pertinent part, 11 U.S.C. § 362(a)(6) provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ..., operates as a stay, applicable to all entities, of—

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

The protections of the automatic stay only enure to the benefit of the debtor, property of the debtor, or property of the estate. *In re Advanced Ribbons and Office Products, Inc.*, 125 B.R. 259, 263 (9th Cir. BAP 1991); *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 614 (9th Cir.BAP 1990); *In re Condel, Inc.*, 91 B.R. 79, 82 (9th Cir. BAP 1988); *In re Casgul of Nevada, Inc.*, 22 B.R. 65, 66–67 (9th Cir. BAP 1982). Aside from the co-debtor stay provisions existing under Code Sections 1201 and 1301, there exists no provision in 11 U.S.C. § 362 protecting non-debtors or their property. *In re Advanced Ribbons and Office Products, Inc., supra*, 125 B.R. at 263; *In re Rohnert Park Auto Parts, Inc., supra*, 113 B.R. at 614 approvingly citing *Credit Alliance v. Williams*, 851 F.2d 119, 121 (4th Cir.1988) for the proposition that Congress knew how to extend the automatic stay to non-debtors and their property by enactment of the co-debtor

stay provisions. In fact, extension of the automatic stay protection to non-debtors and their property would render the co-debtor stay provisions under Code Sections 1201 and 1301 mere surplusage. *Ibid.*

In determining whether the automatic stay has been violated by the foreclosure, an appropriate starting point is to determine whether the property was property of the estate within the meaning of 11 U.S.C. § 541(a). Section 541(a) of the Code provides in part:

> (a) The commencement of a case ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1) ... all legal or equitable interests of the debtor in property as of the commencement of the case.

■ Debtors are under a mandatory duty to schedule all assets and liabilities unless the Court orders otherwise. 11 U.S.C. § 521(1); Bankr.Rule 1007(b). Similarly, debtors are required to *immediately* inform the trustee as to the location of any real property in which the debtor has an interest. Bankr.Rule 4002(3). This rule complements those provisions set out in 11 U.S.C. § 521(1) and Bankruptcy Rule 1007(b) in that the trustee must have this information in order to effectively perform the administrative duties proscribed under the Code. (See Editors' Comments, Bankr. Rule 4002(3), *Norton Bankruptcy Law & Practice*, Callaghan, 1990–1991 Ed. at p. 249). While it is possible that property of the estate may exist that is not scheduled (i.e., unknown assets, nondisclosed assets, etc.), the clear import of the above Code sections and Rules requires all debtors to promptly schedule all *known* property of the estate.

■ All schedules and amendments thereto are completed under penalty of perjury by the debtors. Moreover, Rule 9011(a) in pertinent part provides:

> "The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well-grounded in fact and is warranted by existing law ... and that it is not interposed for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation."

The schedules, as originally filed June 30, 1990, reflect only one lease and no executory contracts. As previously set out, this lease was the lease of 120 acres of open ground from Mercedes Velasco for the annual payment of $20,000.00. Debtors' amendment to the schedules filed April 19, 1990, deleted this business lease, and there is no reference whatsoever to any other lease agreements (oral or written) which Debtors now claim exist.

■ Debtors also advance that the foreclosure violated the automatic stay in that their residence is located on the property foreclosed upon. However, the distinguishing factor is that the non-judicial foreclosure only affects legal title to the property and not any possessory right of the Debtors. *Bryant v. Hobert,* 44 Cal.App. 315, 317, 186 P. 379 (1919) citing *Weber v. McCleverty,* 149 Cal. 316, 86 P. 706 (1906); *MacLeod v. Moran,* 153 Cal. 97, 94 P. 604 (1908), and *Athearn v. Ryan,* 154 Cal. 554, 98 P. 390 (1908); see also *Central Savings Bank of Oakland v. Lake,* 201 Cal. 438, 448, 257 P. 521 (1927) cert. denied 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432 (1927); *Hohn v. Riverside County Flood Control Etc. District,* 228 Cal.App.2d 605, 608–610, 39 Cal.Rptr. 647 (1964). Although the residence was originally scheduled as a real property asset of the estate, Debtors subsequently deleted the same when they amended their schedules April 19, 1990.[12]

■ Debtors also fail to include as assets in the original or amended schedules the four promissory notes[13] assigned to

---

**12.** The original and amended B–1 schedules are attached hereto as Exhibits "D" and "E" respectively.

**13.** Each of these notes are scheduled in the amount $65,000.00. The obligees are Debtors' children, John Torrez, III, Joe Torrez, Pedro Torrez, and Rachel Torrez Tristao. It appears from the original and amended A–2 schedules

FmHA. Moreover, Debtors, in their October 12, 1989, opposition to Lawrence's motion filed in this case to impound funds, disclose sources of income, and to require direct payment of funds to blocked account, assert that they did not schedule these notes as assets of the estate in their schedules "because of the assignment to FmHA." The unrefuted evidence further shows that the three deeds of trust reference parcels 1, 2, 3, 5, and 8 (See Exhibit "A" hereto) securing the payments due under the promissory notes from Pedro Torrez, Joseph Torrez, and Rachel Torrez Tristao, were assigned to the Torrez Family Trust on December 15, 1980.[14] No evidence exists as to who holds the equitable interests respecting the trust corpus. Northwestern correctly points out that property held in trust by a debtor is not includable as property of the estate. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 fn. 10, 103 S.Ct. 2309, 2314, 76 L.Ed.2d 515, 522 (1983); accord in *Begier v. IRS*, 495 U.S. ——, 110 S.Ct. 2258, 110 L.Ed.2d 46, 59 (1990); see also *In re Bullion Reserve of North America*, 836 F.2d 1214 (9th Cir.), *cert. denied sub nom., Bozek v. Danning*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). Accordingly, any interests existing under these three deeds of trust existed for the benefit of the family trust and not Debtors individually.

The Ninth Circuit recognizes that if debtors are allowed to omit claims in bankruptcy and then later assert title thereto, there might be an inducement to do so, to the prejudice of creditors' interests. *Stein v. United Artists Corp.*, 691 F.2d 885, 892 (9th Cir.1982). The same type of reasoning applies in the instant matter. The Code clearly mandates prompt scheduling of all assets and liabilities by debtors. Moreover, due diligence is required to promptly amend schedules to aid in the administration of the case and also to allow creditors to track the case in order to protect their respective interests. Record title controls respecting creditors such as Northwestern

and moreover, creditors must be able to rely on schedules prepared by debtors and their attorneys in enforcing their rights under security documents. *In re Gregg's Custom Vans*, 122 B.R. 727, 728 (Bkrtcy. W.D.Mo.1991); see also *In re B & B Enterprise*, 69 B.R. 45, 47 (Bkrtcy.E.D.Mo.1986).

The Court cannot now sanction Debtors' claim that the children's property was property of the estate. Debtors originally scheduled their residence as estate property and then deleted the same in their amended schedules. Debtors also scheduled the assigned notes as security for the debt owed to FmHA. They did not amend their schedules to reflect the notes as assets of the estate. Moreover, as referenced earlier, Debtors did not schedule the notes as assets of the estate because of the assignment to FmHA. Debtors also deleted reference to all leases in their amended schedules. Allowing Debtors to now assert that a lease exists and that the property was property of the estate after declaring under penalty of perjury as to what property did constitute their estate, would be to condone a practice contrary to the mandate set out under the Code. The Code clearly requires prompt completion of the schedules to facilitate the orderly administration of the estate. This Court would not want to foster sentiments that Debtors may knowingly delay in the scheduling of estate assets to the detriment of the creditors and trustee. The record is replete with facts clearly showing that debtors knew of, or at least should have known of, the existence of any right in the property that might have been includable as estate property. It would be unduly prejudicial and contrary to the mandate of the Code to allow Debtors to assert at this late juncture after the foreclosure and after the case is nearly two years old, that the real property is estate property within the meaning of 11 U.S.C. § 541.

Debtors possessed no interest in the properties includable as estate property un-

---

that the assignment of the notes was as additional security for the $1.8 million claim held by FmHA against the estate.

**14.** Pursuant to Northwestern's request for judicial notice, the Court takes notice Exhibits "17" through "19", the assignments of deeds of trust, pursuant to F.R.E. Rule 201.

der the contemplation of 11 U.S.C. § 541(a). The only interest Debtors possessed respecting the property is a possessory interest. Consensual and permissive presence and possession is not a legal or equitable interest includable as estate property. *In Re Shipley*, 35 B.R. 251 (Bkrtcy.D.Haw. 1983); *In re Smith*, 105 B.R. 50, 54 fn. 6 (Bkrtcy.C.D.Cal.1989); *In re Kennedy*, 39 B.R. 995, 997 (C.D.Cal.1984); *In re Waters*, 60 B.R. 339, 342 (Bkrtcy.E.D.Wis.1986) approvingly citing *Kennedy, supra*. Contrary to the contentions advanced by Debtors and Lawrence, Debtors, to date, still retain their possessory interest. The foreclosure has not had the effect of removing debtors from their residence. Respecting the notes secured by the junior trust deed, upon assignment as security to FmHA, Debtors admittedly were divested of any interest therein and accordingly did not schedule the notes as assets of the estate. Case law further supports this proposition. See *Adler v. Sargent*, 109 Cal. 42, 41 P. 799 (1895) holding that assignee receives right to security upon assignment of promissory note.

While the scope and provisions of the automatic stay are very broad, [*In re Bialac*, 712 F.2d 426, 431 (9th Cir.1983) ], the protection is not limitless and the stay cannot extend without bounds. Accordingly, the Court finds and holds that the facts clearly indicate the children's property foreclosed upon was not property of the estate. The Court further finds and holds that the notes assigned to FmHA and the alleged oral lease are not property of the estate within the meaning of 11 U.S.C. § 541(a).

**H. EFFECT OF 11 U.S.C. § 362(a)(3)**

▆▆▆ 11 U.S.C. § 362(a)(3) stays any act to obtain possession of estate property or of property from the estate as well as acts designed to exercise control over estate property. In light of the determination that the properties foreclosed upon were not estate property, this provision can only apply if Northwestern's foreclosure was an act to obtain property *from* the estate. There is no competent evidence

before the Court that Northwestern has acted to take property from the estate. To the contrary, the evidence through John Torrez Jr.'s declaration indicates that the Debtors still reside in the residence and that the other buildings out of which they perform their custom farm services (all of these buildings including the residence are located on Rachel Torrez Tristao's parcel) are still available for their use. Accordingly, the Court finds and holds that the provisions of 11 U.S.C. § 362(a)(3) have not been violated by Northwestern's foreclosure as there has been no act taking property from the estate. The Court would like to point out that should Northwestern seek to remove Debtors through an unlawful detainer action brought in the appropriate state court, absent relief from the automatic stay, such an action would be violative of 11 U.S.C. § 362(a)(1).

**I. WAS THE STAY UNDER 11 U.S.C. § 362(a)(6) VIOLATED BY THE FORECLOSURE?**

Lawrence asserts that the automatic stay under 11 U.S.C. § 362(a)(6) was violated as the foreclosure on the real property was pursuant to an obligation owed by the Debtors, and therefore constituted an act to collect or recover a claim against the debtors specifically stayed under 11 U.S.C. § 362(a)(6).

Northwestern on the other hand argues that 11 U.S.C. § 362(a)(6) prevents only an act *"against"* the debtor. They assert that the cases addressing the issue of whether the stay applies to a foreclosure of property which the debtor conveyed to third parties pre-petition have held that the stay has no application as it is not an action "against" the debtor. Citing *In re Shipley*, 35 B.R. 251 (Bkrtcy.D.Haw.1983); *In re Kona Hawaiian Associates*, 41 B.R. 191 (Bkrtcy.D.Haw.1984); *Matter of Brannan*, 40 B.R. 20 (Bkrtcy.N.D.Ga.1984); *Matter of Pestritto*, 108 B.R. 850 (Bkrtcy.S.D.Ga. 1989); *In re Price Chopper Supermarkets, Inc.*, 40 B.R. 816 (Bkrtcy.S.D.Cal. 1984) Northwestern also argues that this case involves a "joint obligation" on the notes and references Exhibit "4" to their motion. (fn. # 1, Northwestern's supple-

mental reply to Lawrence's supplemental opposition.)

Initially, the Court notes that none of the cases cited as authority by Northwestern specifically deal the application or scope of the stay protection afforded under 11 U.S.C. § 362(a)(6). Further, the Court has reviewed Exhibit "4" to ensure that it evidences a joint obligation on the note as asserted by Northwestern. Exhibit "4" is an Amendment of Deed of Trust and Notice of Additional Loan. It is not an amendment to the promissory note. The amended Promissory Note [15] evidences the additional $250,000.00 loan that was consolidated with the original loan and made payable as one debt. (See ¶ 2 of the Amendment of Promissory Note). The obligors under the amended promissory note are John Torrez, Jr. and Jessie Torrez, Debtors herein. The Debtors' children did not execute the original note nor were they signatories to the Amendment of Promissory Note. Under California law, a deed of trust secures the debt which the promissory note evidences. *Matthews v. Hinton,* 234 Cal.App.2d 736, 44 Cal.Rptr. 692 (1965); *Schwerin v. Shostak,* 213 Cal.App.2d 37, 42, 28 Cal.Rptr. 332 (1963); *Dool v. First National Bank,* 107 Cal.App. 585, 588, 290 P. 478 (1930). A person can obligate their property for the debt of another without ever having signed a promissory note thereby assuming personal liability on the note. *Matthews, supra* 234 Cal.App.2d at p. 742, 44 Cal.Rptr. 692; *Ford v. Ford,* 276 Cal.App.2d 9, 13, 80 Cal.Rptr. 435 (1969).

Applying the above principles to the facts herein compel a finding that Northwestern's foreclosure was initiated in response to Debtors' default under the promissory note respecting their debt. The Court further finds that the children were not obligors under the promissory note and further that the obligation was not a joint debt as asserted by Northwestern.

Lawrence advances several cases in support of their position that the automatic stay under 11 U.S.C. § 362(a)(6) was violated. They argue that the protections under § 362(a) are to be applied broadly.

In *In re Heafitz,* 85 B.R. 274 (Bkrtcy. S.D.N.Y.1984), the court held that a partnership's retention of a partner's distributive share through "self-help" recoupment (although the distribution was arguably not estate property) was violative of 11 U.S.C. § 362(a)(6) in light of the breadth of the provision.

In *Matter of St. Amant,* 41 B.R. 156 (Bkrtcy.D.Conn.1984), the court held the transfer of debtor's *ownership interest* in property pursuant to the litigated terms of a foreclosure judgment violative of 11 U.S.C. § 362(a)(6). The transfer was an act to collect, assess, or recover a prepetition claim against the debtor. (The opinion also noted that other sections of 11 U.S.C. § 362(a) were violated by the transfer.)

In *In re Nelson,* 6 B.R. 248 (Bkrtcy. D.Kan.1980), the court held a bank's set-off (arising from a prepetition claim) against a debtor's post-petition earnings deposited in a joint tenancy bank account to be violative of 11 U.S.C. § 362(a)(6). The evidence in *Nelson* was undisputed that the sole source of funds in the joint account was debtor's paycheck. The court noted that the bank's interest in the joint account was limited to the interest of the co-tenant, who was also obligated on the promissory note in default.

These cases, while at first blush seemingly address the issue at hand, are clearly distinguishable. Each involved a creditor's act to recover on a claim against property that either was, or arguably was, the debtors and/or property of the estate.

In the instant proceeding, the foreclosure was not against Debtors' property or property of the estate. Therefore, *Heafitz, St. Amant,* and *Nelson* are inapposite to the instant controversy.

Lawrence also cites *Valley Transit Mix of Ruidoso, Inc.,* 928 F.2d 354 (10th Cir. 1991), *In re Barksdale,* 15 B.R. 731 (Bkrtcy.W.D.Vir.1981), and *In re Pioneer Valley Indoor Tennis Center,* 20 B.R. 884 (Bkrtcy.D.Mass.1982) supporting its contention that where the *debt* sought to be satisfied is the debtor's, 11 U.S.C.

---

**15.** Attached to Northwestern's motion as Exhibit "3".

§ 362(a)(6) stays any act to collect thereon notwithstanding the fact that the property from which satisfaction is sought stands in the name of an entity other than the debtor.

A strict reading of 11 U.S.C. § 362(a)(6) indicates that it stays acts to recover a "claim" against the debtor, and not a debt owed by the debtor. Accordingly, *Valley Transit Mix of Ruidoso, Inc., Barksdale* and *Pioneer Valley* are not dispositive to this controversy as they do not account for the definition of "claim" as set out in 11 U.S.C. § 101(4).

The Court's own research has unearthed a very recent Bankruptcy Appellate Panel decision with similar facts involving the stay under 11 U.S.C. § 362(a)(6). While it is still an open question in the 9th Circuit as to the binding effect of BAP decisions on all bankruptcy courts within the circuit, this Court believes that BAP opinions should be binding and follows such reasoning. *Bank of Maui v. Estate Analysis, Inc.,* 904 F.2d 470 (9th Cir.1990) see concurring opinion recommending binding effect of BAP decisions on all bankruptcy courts within the circuit.

In *In re Advanced Ribbons and Office Products, Inc.,* 125 B.R. 259 (9th Cir. BAP 1991), the debtor executed two promissory notes in the combined amount of $2.4 Million. One note was secured by the debtor's accounts receivables, equipment, inventory and other assets. Additionally, the sole-shareholder of the debtor, through a pledge agreement, pledged all of his stock in the debtor as additional security for the obligations under one of the notes. Debtor subsequently defaulted on the note payments and the creditor proceeded as required to sell the stock security at a public foreclosure sale. On the same day as the foreclosure sale and immediately prior to the time set for sale, the debtor filed its petition under Chapter 11 of the Code and informed the creditor of its petition. Nevertheless, the foreclosure sale occurred with the creditor successfully credit bidding and purchasing the security.

In analyzing whether the sale was violative of 11 U.S.C. § 362(a)(6) as argued by debtors counsel, the BAP concluded that the claim did not involve collection of a "claim" against the debtor. The BAP held that the foreclosure involved a collection of a "claim" against the shareholder's stock in the debtor. In holding that obligation was analogous to an action against a guarantor, the BAP noted that the obligation to the creditor is no more separate and independent from the primary debtor's obligation than that owed by the shareholder. All such obligations arise from a document by which a party agrees to answer for the debt of another. The BAP further noted that the creditor possessed three claims from which it could collect upon the default under the note. These three claims were against the debtor, the debtor's property and the shareholder's stock. The BAP in part reasoned that there was no violation of 11 U.S.C. § 362(a)(6) by turning to the definition of "claim" as set out in 11 U.S.C. § 101(4), which defines "claim" as a "right to payment" or a "right to an equitable remedy" for breach of performance if such performance gives rise to a right to payment. Similarly, 11 U.S.C. § 101(11) defines "debt" as liability on a claim.

In the instant matter, the record reflects that Debtors defaulted under the promissory note in 1983, subsequently brought the payments current, and thereafter defaulted again failing to make any payments after March 1, 1985.

Upon Debtors receiving the additional $250,000.00 loan from Northwestern, Debtors' children, by executing the Amendment of Deed of Trust, pledged their properties a security for the debt of the debtors. *Matthews v. Hinton, supra,* 234 Cal.App.2d 736, 44 Cal.Rptr. 692; *Schwerin v. Shostak, supra,* 213 Cal.App.2d at p. 42, 28 Cal.Rptr. 332; *Dool v. First National Bank, supra,* 107 Cal.App. at 588, 290 P. 478; *Ford v. Ford, supra,* 276 Cal.App.2d at p. 13, 80 Cal.Rptr. 435. In this instance, as in *Advanced Ribbons,* Northwestern has acted to recover its claim, or right to payment, from the Debtors' children under the promise or pledge of property to an-

swer for the default of their parents implicit in the Amendment of Deed of Trust.

Reviewing the definition of "claim" indicates that under the plain and literal language of 11 U.S.C. § 362(a)(6), the action was not on a claim against Debtors. In determining the scope of a statute, one first looks at its language. *North Dakota v. United States*, 460 U.S. 300, 103 S.Ct. 1095, 75 L.Ed.2d 77 (1983). Where the language is unambiguous, ordinarily it is to be regarded as conclusive unless there is "a clearly expressed legislative intent to the contrary." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983). Nothing advanced by Lawrence indicates that the legislature intended the scope of 11 U.S.C. § 362(a)(6) to preclude creditors from acting against claims or enforcing rights to payment against non-debtors. The only interpretation of 11 U.S.C. § 362(a)(6) warranted is that it precludes acts to collect, assess, or recover a claim against the debtor only. Adopting Lawrence's view would make the co-debtor stays under the Code virtually meaningless.

Additional support for the proposition that a guarantor's property is not within the realm of protection afforded under 11 U.S.C. § 362(a) exists within the Ninth Circuit. In *In re Bialac*, 712 F.2d 426, 431 (9th Cir.1982), the court, while noting the breadth of protection afforded by the automatic stay, held, that the automatic stay does not preclude efforts to collect from a debtor's guarantors or from their property.

Similarly, the BAP held that a bankruptcy court's order staying the bank's foreclosure efforts as to non-estate property (debtor's principles' residences) given as security on a promissory note executed by the debtor, was contrary to the protection afforded under § 362(a). *In re Casgul of Nevada, Inc.*, 22 B.R. 65, 66 (9th Cir. BAP 1982). The *Casgul* court noted that the automatic stay operates for the benefit of the debtor [¶'s (1), (2), (6)]; the debtor's property [¶ (5)]; or the debtor's estate [¶'s (2), (3), (4)]. The BAP then concluded that the automatic stay did not operate to protect the debtor's officers or their property pledged as security from foreclosure.

### III.

### CONCLUSION

In conclusion and in light of the recent authority in *Advanced Ribbons*, with the support of *Bialac* and *Casgul*, this Court finds and holds that Northwestern did not violate 11 U.S.C. § 362(a)(6) when it foreclosed upon the children's property. The automatic stay was not intended to preclude creditors from seeking their right to payment from those who answer for the debts of debtors. Rather, the automatic stay exists to prevent acts against debtors themselves, their property, or estate property. To extend such a broad interpretation of the stay provisions in this instance as advanced by Northwestern would be to create a stay against non-debtors under § 362(a) which was clearly not intended by the legislators when enacting the Code.

EXHIBIT A

tvc 3276 pge 783

DESCRIPTION OF PROPERTY:

PARCEL NO. 1:

THE EAST 30 ACRES OF THE WEST 60 ACRES OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THE EAST 195 FEET OF THE WEST 479 FEET OF THE NORTH 225 FEET THEREOF.

ALSO EXCEPTING AN UNDIVIDED ONE-HALF INTEREST IN ALL OIL, GAS, ASPAHLT, SILVER, URANIUM, HYDROCARBON, MINERAL, AND/OR OTHER DEPOSITS IN OR UPON SAID PARCEL NO. 1, WHETHER OR NOT EACH OTHER DEPOSITS ARE SIMILAR OR DISSIMILAR TO ANY OF THE DEPOSITS SPECIFICALLY MENTIONED TOGETHER WITH INCIDENTAL RIGHTS, AS RESERVED BY HITTIE L. MC DOUGALL, A WIDOW, IN THAT CERTAIN DEED DATED FEBRUARY 27, 1957, RECORDED MARCH 19, 1957 IN BOOK 1983, PAGE 614 OF OFFICIAL RECORDS.

PARCEL NO. 2:

THE WEST 30 ACRES OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING AN UNDIVIDED ONE-FOURTH INTEREST IN ALL OIL, GAS, ASPHALT SILVER URANIUM, HYDROCARBON, MINERALS AND/OR OTHER DEPOSITS IN OR UPON SAID PARCEL NO. 2, WHETHER OR NOT SUCH OTHER DEPOSITS ARE SIMILAR OR DISSIMILAR TO ANY OF THE DEPOSITS SPECIFICALLY MENTIONED, TOGETHER WITH INCIDENTAL RIGHTS, AS RESERVED BY JAMES W. MC DOUGHAL A MARRIED MAN, IN THAT CERTAIN DEED DATED FEBRUARY 28, 1957, RECORDED MARCH 19, 1957 IN BOOK 1983 PAGE 612 OF OFFICIAL RECORDS.

ALSO EXCEPTING AN UNDIVIDED ONE-FOURTH INTEREST IN ALL OIL, GAS, ASPHALT, SILVER, URANIUM, HYDROCARBON, MINERAL AND/OR OTHER DEPOSIT IN OR UPON SAID PARCEL NO. 2, WHETHER OR NOT SUCH OTHER DEPOSITS ARE SIMILAR OR DISIMILAR TO ANY OF THE DEPOSITS HERETOFORE SPECIFIC ALLY MENTIONED, TOGETHER WITH INCIDENTAL RIGHTS, AS RESERVED BY RUB E. MC DOUGHALL, A WIDOW, IN THAT CERTAIN DEED DATED MARCH 9, 1957, RECORDED MARCH 19, 1957 IN BOOK 1983, PAGE 613 OF OFFICIAL RECORDS.

ALSO EXCEPTING ALL MINERAL RIGHTS AS DESCRIBED IN A DEED RECORDED JUNE 11, 1975 FILE NO. 21554.

PARCEL NO. 3:

THE EAST 20 ACRES OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDI TO THE OFFICIAL PLAT THEREOF.

PARCEL NO. 4:

LOTS 41 TO 48, BOTH INCLUSIVE, OF ELK BAYOU COLONY, IN THE COUNTY OF TULARE, STATE OF STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16, PAGE 36 OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING ALL OF THE OIL, GAS AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE AND DESCRIPTION IN OR UNDER LOTS 45 TO 48, BOTH INCLUSIVE, AS RESERVED IN THE DEED FROM SECURITY COMPANY, A CORPORATION, DATED DECEMBER 22, 1941, RECORDED JANUARY 9, 1942 IN BOOK 973, PAGE 229 OF OFFICIAL RECORDS.

THE INTEREST OF SECURITY COMPANY, A CORPORATION, IN SAID OIL, GAS AND MINERALS HAS SINCE BEEN CONVEYED TO SOUTHERN REALTY COMPANY, A CORPORATION, BY DEED DATED JANUARY 31, 1950, RECORDED FEBRUARY 17, 1950 IN BOOK 1420, PAGE 1313 OF OFFICIAL RECORDS.

PARCEL NO. 5:

THE NORTHWEST QUARTER OF SECTION 16, AND THOSE PORTIONS OF THE SOUTH HALF OF SECTION 9, AND OF THE NORTHWEST QUARTER OF THE SOUTH-WEST QUARTER OF SECTION 10, AND OF THE NORTHEAST QUARTER OF SECTION LYING NORTH AND WEST OF ELK BAYOU, ALL IN TOWNSHIP 21 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL NO. 6:

LOTS 53 TO 56, BOTH INCLUSIVE, OF ELK BAYOU COLONY, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, AS PER MAP RECRODED IN BOOK 16, PAGE 36 OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL NO. 7:

THE WEST HALF OF LOT 52 OF ELK BAYOU COLONY, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 16, PAGE 36 OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER MINERAL AND MINERAL RIGHTS OF WHATEVER NATURE AND DESCRIPTION IN OR UNDER SAID LOT AS RESERVED IN THE DEED FROM SECURITY COMPANY, A CORPORATION, DATED DECEMBER 22, 1941, RECORDED JANUARY 9, 1942 IN BOOK 973 PAGE 299 OF OFFICIAL RECORDS.

PARCEL NO. 8:

THE SOUTHEAST QUARTER OF SECTION 20, TOWNSHIP 21 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

## EXHIBIT B

### UNITED STATES BANKRUPTCY COURT

for the EASTERN District of CALIFORNIA

*Official Form 6 - 1983*

IN RE
**JOHN TORREZ, JR. and JESSIE S. TORREZ**

Case No. **189-02478B-11F**

Debtor

*SET FORTH HERE ALL NAMES INCLUDING TRADE NAMES
USED BY DEBTOR WITHIN THE LAST SIX YEARS.*

Social Security No. (H) 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 (W)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
or Employer's Tax
Identification No.

## SCHEDULE A-2 - CREDITORS HOLDING SECURITY

| Name of creditor and complete mailing address including zip code (if unknown, so state.) | Description of security and date when obtained by creditor | Specify when claim was incurred and the consideration therefor; when claim is subject to setoff, evidenced by a judgment, negotiable investment, or other writing, or incurred as partner or joint contractor, so indicate; specify name of any partner or joint contractor on any debt | Indicate if claim is contingent, unliquidated, or disputed | Market Value | Amount of claim without deduction of value of security |
|---|---|---|---|---|---|
| **NORTHERN WESTERN MUTUAL**<br>P.O. Box 1430, Visalia, CA 93279<br>Secured by 1st deed of Trust on Residence and 388 acres<br>250 Ranch - 250 Acres | | | | $833,000.00<br>$425,000.00 | $700,000.00 |
| **FARMERS HOME ADMINISTRATION**<br>Argicultural Dept., 1963 East Tulare Avenue, Tulare, CA 93274<br>Secured by 2nd Deed of Trust on Residence & 250 Ranch.<br>And by assignment of notes from John Torrez III....................<br>Joe Torrez<br>Pedro Torrez<br>Rachel TorrezTristao<br>and sales subject to sale price of John Torrez $69,750.00, Rachel Tristao Torrez approx. $190,000 and Equipment $50,000. | | | | $65,000.00<br>$65,000.00<br>$65,000.00<br>$65,000.00 | $1,800,000.00 |
| **MORRIS PLAN** (209) 734-8106<br>1800 S. Mooney Blvd. , Visalia, CA 93277<br>Secured by lien on 1984 Cadillac | | | | $8,500.00 | $8,500.00 |
| **J.D. HEISKEL & CO.**<br>P.O. Box 28, Tulare, CA 93275<br>Secured by lien on Crops | | Unknown | | | $320,000.00 |

Running TOTAL $2,828,500.00 TOTAL this page $2,828,500.00

# EXHIBIT C

### ι .TED STATES BANKRUPTCY COURT

### for the EASTERN District of CALIFORNIA

*Official Form 6 - 1983*

IN RE
**JOHN TORREZ, JR. and JESSIE S. TORREZ**

Case No. **189-02478A-11F**

Debtor

*SET FORTH HERE ALL NAMES INCLUDING TRADE NAMES*
*USED BY DEBTOR WITHIN THE LAST SIX YEARS.*
Social Security No. (H) 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 (W)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
or Employer's Tax
Identification No.

## SCHEDULE A-2 - CREDITORS HOLDING SECURITY

| Name of creditor and complete mailing address including zip code (if unknown, so state.) | Description of security and date when obtained by creditor | Specify when claim was incurred and the consideration therefor; when claim is subject to setoff, evidenced by a judgment, negotiable instrument, or other writing, or incurred as partner or joint contractor, so indicate; specify name of any partner or joint contractor on any debt | Indicate if claim is contingent, unliquidated, or disputed | Market Value | Amount of claim without deduction of value of security |
|---|---|---|---|---|---|
| | | **Corrected** | | | |
| **NORTH WESTERN MUTUAL** P.O. Box 1430, Visalia, CA 93279 Secured by 1st Deed of Trust on 250 Ranch - 250 Acres | | | | $833,000.00 $425,000.00 | $700,000.00 |
| **FARMERS HOME ADMINISTRATION** Agricultural Dept., 1963, East Tulare Avenue, Tulare CA 93274 | | | | | |
| 1. Secured by 2nd Deed of Trust on 250 Ranch | | | | | |
| 2. By assignment of notes from John Torrez,III............ | | | | $65,000.00 | $1,800,000.00 |
| Joe Torrez............... | | | | $65,000.00 | |
| Pedro Torrez............ | | | | $65,000.00 | |
| Rachel Torrez Tristao.............. | | | | $65,000.00 | |
| 3. By prior sales with net sale price to John Torrez $110,000 and Rachel Torrez Tristao approx. $190,000 | | | | | $8,500.00 |
| 4. By Equipment $50,000...................... | | | | $50,000.00 | |
| 5. By lien on 1989 Crop proceeds................ | | | | $600.00 | |
| 6. By 1st Deed of Trust on 153 Acre Parcel............ | | | | $371,000.00 | |
| 7. By 1st Deed of Trust on 71 Acre Parcel............ | | | | $144,000.00 | |
| | | **Amended** | | | |

| | | | | |
|---|---|---|---|---|
| Running TOTAL | $5,337,000.00 | TOTAL this page | | $2,508,500.00 |

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT

for the EASTERN District of CALIFORNIA

*Official Form 6 - 1983*

IN RE
**JOHN TORREZ, JR. and JESSIE S. TORREZ**

Case No. **189-02478B-11F**

Debtor

*SET FORTH HERE ALL NAMES INCLUDING TRADE NAMES
USED BY DEBTOR WITHIN THE LAST SIX YEARS.*
Social Security No. (H) 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 (W)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
or Employer's Tax
Identification No.

## Schedule B - STATEMENT OF ALL PROPERTY OF DEBTOR

Schedules B-1, B-2, B-3, and B-4 must include all property of the debtor as of the date of the filing of the petition by or against him.

### SCHEDULE B-1 - REAL PROPERTY

| Description and location of all property in which debtor has an interest (including equitable and future interests, interests in estates by the entirety, community property, life estates, leaseholds, and rights and powers exercisable for his own benefit) | Nature of interest (specify all deeds and written instruments relating thereto) | Market value of debtor's interest without deduction for secured claims listed in Schedule A-2 or exemptions claimed in Schedule B-4 |
|---|---|---|
| Residence located on 388 Acres | | $833,000.00 |
| 250 Ranch - 250 Acres | | $425,000.00 |

| Running TOTAL | $1,258,000.00 | TOTAL this page | $1,258,000.00 |
|---|---|---|---|

## EXHIBIT E

**.TED STATES BANKRUPTCY COURT**

for the EASTERN District of CALIFORNIA

*Official Form 6 - 1983*

IN RE
**JOHN TORREZ, JR. and JESSIE S. TORREZ**

Case No. **189-02478A-11F**

Debtor

*SET FORTH HERE ALL NAMES INCLUDING TRADE NAMES
USED BY DEBTOR WITHIN THE LAST SIX YEARS.*
Social Security No. (H) 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 (W)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
or Employer's Tax
Identification No.

## Schedule B - STATEMENT OF ALL PROPERTY OF DEBTOR

Schedules B-1, B-2, B-3, and B-4 must include all property of the debtor as of the date of the filing of the petition by or against him.

### SCHEDULE B-1 - REAL PROPERTY

| Description and location of all property in which debtor has an interest (Including equitable and future interests, interests in estates by the entirety, community property, life estates, lease-holds, and rights and powers exercisable for his own benefit) | Nature of interest (specify all deeds and written instruments relating thereto) | Market value of debtor's interest without deduction for secured claims listed in Schedule A-2 or exemptions claimed in Schedule B-4 |
|---|---|---|
| **Delete-** Residence located on 388 Acres | | |
| **Corrected** | | |
| 1) 250 Acre Ranch= $535,000 ( In Tulare County ) | | $ 535,000.00 |
| 2) 15 3 Acre Ranch= $371,000 ( In Tulare County ) | | $ 371,000.00 |
| 3) 71 Acre Ranch= $144,000 ( In Tulare County ) | | $ 144,000.00 |
| **Amended** | | |
| Running TOTAL $1,050,000.00 | TOTAL this page | $1,050,000.00 |